FRANCISCO FELICIANO ROSADO y su esposa JUANA ROSADO, por sí y como CO-ADMINISTRADORES DE LA SOCIEDAD DE GANANCIALES que tienen constituida, y OTROS, demandantes y recurridos, *v.* HONORABLE PABLO MATOS, JR., y su esposa "FULANA DE TAL", demandados y peticionarios.

*Número:* O-79-558        *Resuelto:* 7 de enero de 1981

*Héctor Santiago Rivera* y *Luz I. Burgos Santos,* abogados de la parte recurrente; *Quetglas, Subirá, Gaztambide & Arrillaga, Roberto Santana Aparicio, Luis A. Rivera Lacourt,* abogados de la parte recurrida.

EL JUEZ ASOCIADO SEÑOR TORRES RIGUAL emitió la opinión del Tribunal.

Este Tribunal se confronta por primera vez con una cuestión de eminente y primordial importancia para el fiel desempeño de la función judicial dentro de los más altos ideales de justicia en una sociedad constituida bajo el principio de que toda persona, no importa su jerarquía, está sometida al imperio de la ley. Es más que una cuestión técnica de derecho; entran en juego en este caso serias consideraciones de política judicial con respecto a la responsabilidad civil de jueces y magistrados por daños causados en el desempeño de sus funciones oficiales.

En esencia, nos confrontamos en esta cuestión con dos enfoques que se apoyan en argumentos de no poca persuasión; uno propugna la inmunidad absoluta del juez en el descargo de sus funciones, aun cuando actúe movido por malicia, corrupción o con intención aviesa de causar daño; y otro, que es el que aquí seguimos, somete al juez a la norma de una res-

ponsabilidad limitada compatible con la especial naturaleza de su función de adjudicar controversias. Libre debe ser el juez para seguir los dictados de su honesta conciencia y para ello debe recibir la más completa protección del ordenamiento, cuando en sus actuaciones se atiene a las normas de excelencia intelectual y moral que su alto ministerio demanda, aun cuando incurra en error. Pero no debe extenderse esta protección al juez que traiciona su ministerio y la fe del pueblo en sus instituciones de justicia, permitiendo que sus actuaciones judiciales respondan a la malicia y la corrupción. La norma de responsabilidad judicial ha de alcanzar, pues, su mayor eficacia con el reconocimiento indubitable del interés social en que los jueces gocen en el desempeño de su alto ministerio de la mayor protección, pero nunca más allá de lo necesario para garantizar la independencia judicial.

Procede exponer brevemente los hechos que motivan la controversia entablada en este recurso. Los recurridos incoaron demanda en el tribunal de instancia contra el Hon. Pablo Matos, Juez de Paz de Toa Alta, reclamándole la cantidad de $42,000 como compensación por daños morales, más $5,000 de honorarios de abogado. Fundaron su pretensión en que el Juez Matos expidió una orden de arresto contra uno de ellos, Francisco Feliciano Rosado, por infracción de la Ley de Depósitos de Chatarras, Núm. 125 de 27 de junio de 1966 (10 L.P.R.A. sec. 971) consistente en haber abandonado en la vía pública la carrocería de un automóvil desmantelado, y que la orden de arresto fue instigada, diligenciada, aconsejada y dictada por el Juez Matos, a sabiendas de que se arrestaría a Rosado sin haber éste cometido delito alguno.

El Juez Matos solicitó la desestimación de la demanda aduciendo que, como cuestión de derecho, los jueces gozan de absoluta inmunidad por daños causados en el desempeño de sus funciones judiciales. El tribunal de instancia denegó la desestimación solicitada.

Decidimos revisar y resolver la cuestión conforme la Regla

50 del Reglamento de este Tribunal, por haber comparecido ambas partes.

## I

La invocada doctrina de inmunidad absoluta que protege aun la actuación judicial corrupta y maliciosa fue formulada hace más de un siglo por el Tribunal Supremo de los Estados Unidos en *Randall* v. *Brigham*, 74 U.S. 523 (1868), y *Bradley* v. *Fisher*, 80 U.S. 335 (1871), siendo ratificada posteriormente en *Pierson* v. *Ray*, 386 U.S. 547 (1967), *Stump* v. *Sparkman*, 435 U.S. 349 (1978), y *Supreme Court of Va.* v. *Consumers Union*, 444 U.S. 914 (1979). La misma ha sido dura y justamente criticada en innumerables escritos de tratadistas, profesores y otros estudiosos del derecho. Jaffe: *Suits Against Government and Officers: Damage Actions*, 77 Harv. L. Rev. 209, 220 (1963); Feinman & Cohen: *Suing Judges: History and Theory*, 31 S.C.L. Rev. 201 (1980); Forer: *Judicial Responsibility and Moral Values*, 29 Hastings L.J. 1641 (1978); R. F. Nagel: *Judicial Immunity and Sovereignty*, 6 Hastings Const. L.Q. 237 (1978); Rosenberg: *Stump* v. *Sparkman: The Doctrine of Judicial Impunity*, 64 Va. L. Rev. 833 (1978); Kattan: *Knocking on "Wood": Some Thoughts on the Immunities of State Officials to Civil Rights Damage Actions*, 30 Vand. L. Rev. 941 (1977); Alschuler: *Courtroom Misconduct by Prosecutors and Trial Judges*, 50 Tex. L. Rev. 629 (1972); Kates: *Immunity of State Judges under the Federal Civil Rights Acts: "Pierson v. Ray" Reconsidered*, 65 Nw. U.L. Rev. 615 (1971); M. S. O'Bara: Note, *Judicial Immunity or Imperial Judiciary*, 47 UMKC L. Rev. 81 (1978); King: Note, *Judicial Immunity and Judicial Misconduct: A Proposal for Limited Liability*, 20 Ariz. L. Rev. 549 (1978); Voris: Note, *A Judge Can Do No Wrong: Immunity is Extended for Lack of Specific Jurisdiction— "Stump v. Sparkman"*, 27 De Paul L. Rev. 1219 (1978); Lindberg: Note, *Judicial Immunity: An Unqualified Sanction of Tyranny from the Bench?*, 30 U. Fla. L. Rev. 810 (1978);

D. K. Barth: Note, *Immunity of Federal and State Judges from Civil Suit—Time for a Qualified Immunity?*, 27 Case W. Res. L. Rev. 727 (1977); *Developments in the Law—Section 1983 and Federalism*, 90 Harv. L. Rev. 1133, 1200–1204 (1977); Note, *Liability of Judicial Officers Under Section 1983*, 79 Yale L.J. 322 (1969); *Torts—Judicial Immunity—Absolute Immunity Reaffirmed in Stump v. Sparkman*, 27 Kan. L. Rev. 518 (1979); Burke III: *Judicial Immunity*, 22 How. L. J. 129 (1979); B. E. Haddock: *Courts: Judicial Immunity*, 18 Washburn L.J. 158 (1978).

Irónica y desafortunada considera el profesor Tribe la decisión de *Stump* v. *Sparkman*, ante, en la cual se funda la opinión disidente. El eminente jurista se lamenta de la "ironía inequívoca en una postura que exalta las virtudes de modestia y prudencia judicial a la vez que excluye de toda revisión efectiva, apelativa o de otra índole, los excesos arrogantes de alguien que meramente vista la toga". Tribe: *American Constitutional Law*, Mineola, N.Y., Suplemento de 1979, pág. 5. El profesor Nagel destaca la injustificada desproporción entre las limitadas inmunidades legislativa y ejecutiva, de origen constitucional la primera, y la inmunidad judicial que, sin base en ley, tiene ámbito mucho más abarcador. Nagel, *op. cit.* a la pág. 237. En general, las autoridades citadas abogan por restringir el ámbito ilimitado de la norma de inmunidad que cubre bajo su palio protector aun al juez avieso y corrupto, dejando con ello impunes las más insidiosas y grotescas burlas a la justicia. A este respecto son luminosas las palabras del profesor Davis, uno de los tratadistas de mayor influencia en el desarrollo del Derecho Administrativo de los Estados Unidos:

Gran parte del derecho resumido en los capítulos 25 (Responsabilidad en daños de las unidades gubernamentales) y 26 (Responsabilidad en daños de los funcionarios) resulta inadecuado y poco satisfactorio . . . .

Algunos resultados son difíciles de creer: Un funcionario puede expresamente concebir un acto torticero, ejecutarlo deli-

beradamente, infligir intencionalmente el daño, y hasta actuar dentro de las atribuciones principales de su autoridad. Ello no obstante, no tendrá la víctima remedio alguno contra el funcionario o el gobierno.

*Cualquier lector del párrafo precedente probablemente se mostrará escéptico ante el hecho que la injusticia pueda ser tan flagrante.* Los hechos son los de *Imbler* v. *Pachtman,* 424 U.S. 409 (1976) [1] .... (Bastardillas nuestras.) Davis: *Administrative Law Treatise,* San Diego, Cal., K.C. Davis Pub. Co., 1980 Supp., págs. 241–242.

Basta mencionar, como ejemplo extremo de jueces corruptos, el caso de cuatro jueces de la Corte Suprema de Oklahoma que vendieron sentencias en 1,878 casos en el transcurso de 20 años. King, Note, *Judicial Immunity and Judicial Misconduct: A Proposal for Limited Liability,* ante, a la pág. 557.[2] Otro ejemplo de corrupción, esta vez en la Corte de Apelaciones de los Estados Unidos para el Segundo Circuito, lo es el del Juez Martin T. Manton, quien aceptó sobornos por miles de dólares a cambio de dictar varias sentencias favorables a una parte. *United States* v. *Manton,* 107 F.2d 834 (1939).

La objeción a la norma de inmunidad judicial se funda más bien en su carácter absoluto, ya que importantes consideraciones de orden público justifican algún grado de inmunidad. La independencia judicial, la finalidad en la litigación y la evitación de pleitos frívolos constituyen las razones más solidas que se han adelantado para sostener la norma de inmunidad absoluta. *Bradley* v. *Fisher,* ante; *Pierson* v. *Ray,* ante; *Stump* v. *Sparkman,* ante. Son éstos, sin duda, valores de alta estima en la administración de justicia, pero las auto-

---

[1] En este caso, la cuestión envuelta se refería a la inmunidad de los fiscales y el tribunal concluyó que la inmunidad de éstos descansa sobre las mismas consideraciones de orden público que sostienen la inmunidad judicial. 424 U.S. 409, 423.

[2] En una ocasión, cuatro jueces de dicho Tribunal se dividieron $150,000 en pago de la revocación de una sentencia en un caso contributivo. *Ibid.,* pág. 557, nota 64.

ridades consideran que tales fundamentos son insuficientes para justificar una cobertura tan innecesariamente abarcadora. El profesor Jennings menciona, además, otros fundamentos no tan persuasivos que se advierten en la jurisprudencia, a saber: 1) evitar el que hombres acaudalados y responsables se vean disuadidos de servir en la judicatura; 2) las dificultades prácticas que tal ataque colateral a una sentencia o providencia podría suscitar, además de la falta de criterios adecuados para la evaluación de las determinaciones judiciales impugnadas; 3) la existencia de adecuadas oportunidades para obtener un nuevo juicio, o la revocación de la sentencia dictada, a base de prejuicio o error; 4) la injusticia que en el fondo representaría el colocar a una persona en una posición cuyo verdadero propósito es el de requerirle que emita su opinión sobre un asunto en particular, pero al mismo tiempo exponerle a ser penalizado con graves consecuencias personales a base de la opinión de otras personas sobre la misma cuestión. Jennings: *Tort Liability of Administrative Officers*, 21 Minn. L. Rev. 263, 271 (1937).

El ilustre jurista Learned Hand formuló con su habitual claridad la razón de ser de la norma de inmunidad absoluta en los siguientes términos:

Ciertamente está demás decir que un funcionario, de hecho culpable de usar su poder para descargar su rencor sobre los demás, o para cualquier otro fin personal ajeno al bien común, no debiera escapar de responsabilidad por los daños que así cause; y, si en la práctica fuera posible limitar tales querellas a los culpables, sería monstruoso denegar el resarcimiento. La justificación para en efecto denegarlo radica en que es imposible saber si la reclamación está bien fundada hasta que el caso se adjudica; y en que someter a todo funcionario, tanto al inocente como al culpable, al rigor de un juicio y al inevitable riesgo de su resultado, desalentaría el entusiasmo de todos salvo los más firmes, o los más irresponsables, por el decidido descargo de sus deberes. Una y otra vez el interés público exige que se tome acción que podría resultar fundada en el error, confrontada con la cual

podría encontrarse luego un oficial en difícil posición de convencer a un jurado de su buena fe. Sin duda debe haber medios para castigar a los funcionarios públicos que han traicionado sus deberes; pero eso es cosa enteramente distinta a exponer a aquellos que honestamente han errado al reclamo de cualquiera que haya sufrido por sus errores. Como tan a menudo ocurre, la solución ha de encontrarse en un balance entre los inevitables males de una u otra alternativa. En este caso se ha pensado a la postre dejar mejor sin resarcir los daños causados por oficiales deshonestos, que someter a aquellos que tratan de cumplir con su deber al constante temor de la represalia. *Gregoire* v. *Biddle,* 177 F.2d 579, 581 (2nd Cir. 1949).

Algunos adoptan con fascinación el anterior argumento, pero un análisis ponderado del mismo nos demuestra que el ilustre jurista, en efecto, reprueba la irresponsabilidad civil del juez que en el descargo de su delicado ministerio actúe movido por cualquier fin personal ajeno al bien común. En esos casos, "sería monstruoso denegar el resarcimiento". Es solo ante la dificultad práctica de distinguir la reclamación fundada de la frívola y viciosa, que se ve obligado a proclamar la inmunidad absoluta.

La dificultad con el argumento del Juez Hand, sin embargo, consiste en la proposición de que el balance de intereses en conflicto es el mismo cuando se trata de evitar reclamaciones frívolas basadas en alegaciones infundadas de malicia y cuando se trata de sopesar el efecto que tendría sobre la función judicial la imposición de responsabilidad en casos en que solo hubiese mediado un sincero error de juicio. La malicia es intrínsecamente reprobable y contraria a derecho, mientras que el error de juicio no lo es, por lo que resulta forzado el argumento, cuando, al justificar la inmunidad por errores de juicio —que todos aceptamos— pretende también justificarla, por las mismas razones, en los casos de malicia, corrupción y cohecho, que son situaciones completamente distintas.

Los profesores Harper y James han cuestionado con

solidez académica la apreciación del eminente jurista Learned Hand:

> El argumento en favor del privilegio condicionado [de jueces y magistrados] a menudo descansa en argumentos que suponen la presencia de malicia en el caso individual, y por ello no responde claramente al señalamiento del Juez Hand; sin embargo, tal vez sugieren una falla en él a pesar de eso. Cuando la imputación es de sincero error eximimos al funcionario porque consideramos que la efectiva imposición de responsabilidad tendría peores consecuencias que la posibilidad de un error en realidad cometido (el cual dadas las circunstancias estamos dispuestos a condonar). *Pero es llevar el argumento bastante lejos decir que la mera indagación en cuanto a malicia tendría peores consecuencias que la posibilidad de que la malicia en efecto hubiese mediado (lo cual no podríamos, ni por un momento, condonar).* Toda vez que el peligro de que se abuse del poder oficial llega al máximo cuando median motivos impropios, el balance aquí podría muy bien inclinarse en la otra dirección. I. Harper & F. James *The Law of Torts,* Boston, Little, Brown & Co., 1956, Vol. 2, pág. 1645. (Énfasis suplido.)

■ Es por eso que la doctrina rechaza la norma de inmunidad absoluta, tradicionalmente sostenida por la jurisprudencia federal en *Bradley* v. *Fisher,* ante; *Pierson* v. *Ray,* ante; y *Stump* v. *Sparkman,* ante. Se han propuesto diversas alternativas para aminorar los inconvenientes prácticos de la imposición de responsabilidad. Algunos sugieren la adopción de una norma de "malicia efectiva", similar a la adoptada por el Tribunal Supremo de los Estados Unidos para casos de libelo en *New York Times Co.* v. *Sullivan,* 376 U.S. 254 (1963), acompañada de la liberal aplicación del mecanismo procesal de la sentencia sumaria. Note, *Liability of Judicial Officers Under Section 1983,* ante, págs. 336–337; Note, *Immunity of Federal and State Judges from Civil Suit—Time for a Qualified Immunity?,* ante, a la pág. 767. Además, se recomienda la creación por estatutos de salvaguardas procesales que protejan adecuadamente a los jueces y magistrados.

King: Note, *Judicial Immunity & Judicial Misconduct: A Proposal for Limited Liability*, ante, pág. 592.

En ésta como en otras áreas del derecho, el tratamiento que imparte el sistema civilista a la responsabilidad civil de sus jueces ha servido de estímulo y ejemplo a los proponentes de la inmunidad judicial limitada, no obstante las reconocidas diferencias en cuanto a la naturaleza de la función social desempeñada por jueces y magistrados en uno y otro sistema. Véanse al respecto, José-Juan Toharia, *El Juez Español*, Madrid, Ed. Tecnos, 1975, págs. 21–25; Note, *Immunity of Federal and State Judges from Civil Suit—Time for a Qualified Immunity?*, ante, a las págs. 743–751; King: Note, *Judicial Immunity and Judicial Misconduct: A Proposal for Limmited Liability*, ante, a las págs. 580–590. Es de rigor, por tanto, volver la mirada hacia el tronco común en búsqueda de más sazonadas perspectivas.

## II

En el Derecho civil, la doctrina sobre la responsabilidad de jueces y magistrados arranca, como tantas otras, del derecho romano. En él se calificaba de cuasidelictivo la actuación del juez que dictaba una sentencia errónea mediando dolo o soborno, viniendo obligado por ello a resarcir el daño causado. J. Arias Ramos, *Derecho Romano*, 6ta ed., Madrid, Ed. Revista de Derecho Privado, 1954, Vols. II-III, págs. 694 y 812; Álvaro D'Ors, *Derecho Privado Romano*, 3ra ed., Pamplona, Ed. Universidad de Navarra, 1977, págs. 142 y 425.

Los antiguos códigos españoles contienen referencias directas a la responsabilidad de los jueces por sus faltas. Almagro Nosete, *Problemática del "recurso" de responsabilidad civil contra Jueces y Magistrados*, Revista de Derecho Procesal Iberoamericano, Núm. 1, 1971, págs. 291, 294–297. En el Fuero Juzgo, por ejemplo, se condenaba al que juzgaba "contra verdad" ya fuese "por amor" o "por ruego", a pagar de sus propios bienes el perjuicio causado o, de no tenerlos en

suficiente cantidad, a recibir cincuenta azotes. Ley XIX, Título I, Libro II, *Los Códigos Españoles Concordados y Anotados,* Madrid, 1847, T. I, pág. 111.

Ya en el período constitucional moderno el principio de responsabilidad judicial adquirió rango constitucional en la Constitución Española de 1812. Desde ese momento ha sido constante su inclusión en todas las constituciones españolas posteriores. Almagro Nosete, *op. cit.,* a las págs. 298 y 299. La reciente Constitución de 1978 destaca este principio en su Art. 117.

La justicia emana del pueblo y se administra en nombre del Rey por Jueces y Magistrados integrantes del poder judicial, *independientes, inamovibles, responsables y sometidos únicamente al imperio de la ley.* Alzaga, *Comentario Sistemático a la Constitución Española de 1978,* Madrid, Ed. del Foro, 1978, págs. **711–714.**

Desde el punto de vista práctico, el principio de responsabilidad judicial logró afincarse con la aprobación de la Ley de Enjuiciamiento Civil de 1881, que creó el recurso de responsabilidad civil de jueces y magistrados. La interacción de esta ley con las disposiciones del Título V de la Ley Orgánica del Poder Judicial de 1870 y los Arts. 18 y 121 a 128 del Código Penal de ese mismo año, dejó definitivamente establecido que los jueces y magistrados españoles responderían civilmente por los daños y perjuicios que resultaran de sus actos criminales —entre los que figuraban la prevaricación y el cohecho— o de su ignorancia o negligencia inexcusable al dictar providencias de tramitación o cualquiera otra resolución manifiestamente contraria a derecho, o al no observar alguna solemnidad del juicio cuya omisión fuese motivo de nulidad. Para una amplia discusión del tema, véanse Manresa, *Comentarios a la Ley de Enjuiciamiento Civil,* 3ra ed., Madrid, 1910, T. II, págs. 216–232; Almagro Nosete, *op. cit.,* págs. 291–309; Santos Briz, *La Responsabilidad Civil,* 2da ed., Madrid, Ed. Montecorvo, 1977, pág. 665; M. Ortiz De

Zúñiga, *De la responsabilidad judicial*, Rev. General de Legislación y Jurisprudencia, T. 25, págs. 99 y ss., 145 y ss. (1864); Carlos López De Haro, *La responsabilidad judicial*, Rev. General de Legislación y Jurisprudencia, T. 132, pág. 404 (1918), T. 133, págs. 75 y ss. y 341 y ss. (1918).

El principio de responsabilidad judicial no es, sin embargo exclusivo del ordenamiento español. También lo encontramos en otras jurisdicciones civilistas como Francia, Italia, Alemania, Suiza y Austria, en las cuales se impone responsabilidad civil a jueces y magistrados. H. Hink, *The German Law of Governmental Tort Liability*, 18 Rutgers L. Rev. 1069 (1964); Note, *Judicial Immunity & Judicial Misconduct: A Proposal for Limited Liability*, ante, pág. 549 y ss.; Note, *Immunity of Federal & State Judges from Civil Suit—Time for a Qualified Immunity?*, ante, pág. 743 y ss.; Almagro Nosete, *op. cit.*, págs. 305–308. En Iberoamérica, rige también en Méjico, Arts. 728 a 737 del Código de Procedimientos Civiles para el Distrito Federal, 21ra ed., Méjico, D.F., Ed. Porrúa, 1976, págs. 166–167, *cf.* Almagro Nosete, *op. cit.*, pág. 307; en Brazil, *cf.* Almagro Nosete, *op. cit.*, pág. 308; en Panamá, Lombardi, *La Responsabilidad Extracontractual Civil en el Derecho Panameño*, Panamá, Facultad de Derecho y Ciencias Políticas de la Universidad de Panamá, 1965, pág. 96; y en la República Dominicana, F. Tavares, Hijo, *Elementos de Derecho Procesal Civil Dominicano*, 3ra ed., República Dominicana, Ed. Librería Dominicana, 1954, Vol. I, págs. 89–90.

En todas las jurisdicciones, sin embargo, se advierte el propósito claro de limitar la responsabilidad de los funcionarios judiciales en comparación con la responsabilidad que en términos generales se impone a las personas que causen daños interviniendo culpa o negligencia. En Francia e Italia la acción de daños contra el juez sólo procede cuando en su actuación ha mediado dolo, fraude o cohecho. Almagro Nosete, *op. cit.*, págs. 305–307. En Alemania se requiere que la actua-

ción impropia del juez constituya delito. Note, *Immunity of Federal & State Judges from Civil Suit—Time for a Qualified Immunity?*, ante, págs. 747–748. Además, la causa de acción generalmente está sujeta a regulación especial. En algunos de estos países es necesario, para incoar la acción, obtener permiso del Juez Presidente del Tribunal Civil de Apelación o del Ministro de Gracia y Justicia. *Ibid.*, págs. 750–751; Almagro Nosete, *op. cit.*, pág. 306. Y es que no son ajenas al ordenamiento civilista las consideraciones de orden público que informan la doctrina de inmunidad judicial en los Estados Unidos. La independencia judicial, el interés en la finalidad de la litigación y la evitación de pleitos frívolos son valores constantes en ambos sistemas. Al respecto nos dice Almagro Nosete:

> Señalada la necesidad de reparar la injusticia, *aun cuando la cosa juzgada permanezca inconmovible,* convendrá que no desdeñemos las dificultades que este principio abstracto plantea en el terreno de lo concreto, *debido a que la independencia, regla de oro del juzgar,* podría verse afectada si la interpretación judicial de la Ley, pudiera ser objeto de inacabable polémica, so *pretexto de interpretación errónea, equivocada o injusta,* fuera del cauce normal de los recursos.
>
> En línea con estas prevenciones, Castro Guimeraes, afirma que el principio general en esta materia debe ser la falta de responsabilidad de los jueces por el daño que sus decisiones causen, ya que gozan de libertad para interpretar las leyes y valorar las pruebas. Pero este principio no puede ser absoluto. Surge así, el concepto de responsabilidad civil de los funcionarios judiciales, limitado a supuestos concretos y taxativos. A esta limitación de responsabilidad del órgano judicial, suele también denominarse "inmunidad especial de los jueces". *Op. cit.,* pág. 305. (Énfasis suplido.)

Como puede verse, no han sido ignoradas en la norma civilista las consideraciones que en la jurisprudencia federal se esgrimen para justificar la inmunidad absoluta.

## III

Abordemos ahora el análisis de nuestro derecho precisando los antecedentes históricos del tema que, como es natural, se asemejan marcadamente a la norma de responsabilidad vigente en el ordenamiento español.

Desde muy temprano rigió en Puerto Rico la norma de responsabilidad judicial estatuida en los códigos de España, en virtud de la extensión a las Indias de las leyes del reino en todo aquello que no estuviese regulado por ley especial. Leyes I y II, Título I, Libro II de la *Recopilación de Leyes de los Reynos de las Indias*, Madrid, Ediciones Cultura Hispánica, 1973, T. I. La Real Cédula del 30 de enero de 1855, en su Capítulo XII, proveía reglas para la sustanciación de un recurso de responsabilidad contra aquellos jueces locales y de partidos, así como contra aquellos ministros de las Reales Audiencias, "que en sus decisiones infringieren las leyes por negligencia ó ignorancia inexcusable". J. Rodríguez San Pedro, *Legislación Ultramarina Concordada y Anotada*, Madrid, 1866, T. 6, pág. 55. Por Real Orden de 25 de septiembre de 1885 se hizo extensiva a Cuba y Puerto Rico la Ley de Enjuiciamiento Civil española de 1881. *Colección Legislativa de España*, T. 135, pág. 805 y ss. En igual forma se extendieron a Puerto Rico el Código Penal de 1870 y la Ley Orgánica del Poder Judicial. *Colección Legislativa de España*, Madrid, 1880, T. 122, pág. 927 y ss.; y T. 146, pág. 24 y ss. Al momento de la ocupación norteamericana, regía, pues, en Puerto Rico el principio de responsabilidad judicial en idénticos términos que en España.

El Gobierno Militar, sin embargo, alteró radicalmente el ordenamiento vigente, siendo derogadas en gran parte las leyes de Enjuiciamiento Civil y Criminal y la Compilación de las Disposiciones Orgánicas de la Administración de Justicia, en virtud de las órdenes Generales Núms. 114 y 118. *Laws, Ordinances, Decrees and Military Orders*, 60th Cong., 2nd Sess., House Doc. No. 1484, Part 4, Washington, Govern-

ment Printing Office, 1909, págs. 2239 y 1146, respectivamente. Sobre el alcance de la reforma llevada a cabo por el Gobierno Militar, véase Trías Monge, *El Sistema Judicial de Puerto Rico*, Río Piedras, P.R., 1978, pág. 52, y del mismo autor, *La Crisis del Derecho en Puerto Rico*, en Boletín de la Academia Puertorriqueña de la Lengua Española, Vol. VII, pág. 31 (1979). No obstante, la norma de responsabilidad judicial quedó inalterada sustancialmente, toda vez que la Orden General 118 contenía disposiciones muy similares a las contenidas en la anterior legislación orgánica judicial. Por otro lado, el Código Penal de 1879, con sus disposiciones sobre prevaricación y cohecho, continuó vigente. Véase L. Muñoz Morales, *Compendio de Legislación Puertorriqueña y sus Precedentes*, Río Piedras, Junta Editora de la Universidad de Puerto Rico, 1948, pág. 120.

Nada dispuso la legislación posterior. Ni el Código de Enjuiciamiento Civil de 1904 ni el de 1933, ni el Código Político de 1902 trataron el tema, no obstante haber recomendado el comisionado puertorriqueño don Juan Hernández López que se regulara la responsabilidad de los funcionarios públicos. *Ibid.*, pág. 275.

La omisión, sin embargo, no revela siquiera remotamente la intención de incorporar a nuestro ordenamiento la norma de inmunidad absoluta. Debe notarse que, ya en el Código Civil de 1902, el Art. 7 imponía responsabilidad al juez que se negara a emitir fallo en cualquier controversia que se le sometiera. 31 L.P.R.A. sec. 7. Igualmente, el Código de Enjuiciamiento Criminal de 1902 impuso responsabilidad al juez que se negara a expedir una orden para un auto de hábeas corpus, luego de habérsele solicitado en debida forma. Art. 500 (34 L.P.R.A. sec. 1772).

No parece lógico, entonces, imputarle al legislador la intención de excluir absolutamente de responsabilidad al juez que actúa movido por perversidad, cohecho o intención de dañar. Es evidente que en este caso el perjuicio a la sociedad

y al individuo es mucho mayor que en los casos anteriormente señalados, por lo que, si el legislador impuso responsabilidad por inacción en los supuestos mencionados, sería un contrasentido suponer que tenía la intención de excusar a los jueces de toda responsabilidad por los daños que pudieran causar con sus actuaciones maliciosas.

La ausencia de regulación específica en el ordenamiento vigente solo significa, a nuestro entender, que el legislador dio por sentado que ésta no era necesaria. La norma general es que existe responsabilidad en todo caso que medie culpa o negligencia, y no podría interpretarse válidamente que se creó una excepción con el mero silencio. La ausencia de regulación específica solo tiene el efecto de remitir toda controversia sobre responsabilidad judicial a la norma general de daños contenida en el Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141. No existe impedimento alguno para que este Tribunal reconozca y configure jurisprudencialmente una norma adecuada de responsabilidad para este supuesto, tal y como anteriormente ha reconocido diversas causas de acción bajo dicho artículo. *Mendoza* v. *Cervecería Corona, Inc.*, 97 D.P.R. 499 (1969); *Vda. de Delgado* v. *Boston Ins. Co.*, 101 D.P.R. 598 (1973).

## IV

La complejidad del asunto y la naturaleza de la función judicial hacen necesario que la formulación de la norma reconozca y concilie la multiplicidad de valores en juego. El mero error de hecho o de derecho no puede ser motivo para que se invada el patrimonio de un juez, en busca de reparación. Están disponibles los recursos de revisión ante los tribunales de mayor jerarquía, para reivindicar derechos que han sido lesionados por las providencias de un juez que de buena fe percibió erróneamente los hechos o el derecho aplicable a determinado caso. Además, el desarrollo de doctrinas jurisprudenciales requiere en los jueces un espíritu libre para la exploración de nuevas avenidas en el derecho, sin el temor

de la posibilidad de verse empobrecido si la solución que imparte al caso no es finalmente acogida. Es atinada, pues, la preocupación que ha recogido la jurisprudencia federal, al sostener que las reclamaciones en daños contra jueces, por errores de hecho o de derecho, menoscaban la función judicial. Es igualmente sólida la preocupación relativa a la perpetuación de los litigios por la frívola interposición de demandas contra jueces.

Las jurisdicciones civilistas, como vimos anteriormente, comparten esas preocupaciones y las han atendido en la regulación específica de la norma de responsabilidad judicial limitada. Pero aun en ausencia de reglamentación, son preocupaciones legítimas que siempre están presentes en toda acción bajo el Art. 1802 del Código Civil, pues la Ley no permite el ejercicio del derecho en forma abusiva o contraria a las necesidades de la sociedad. *Soriano Tavárez* v. *Rivera Anaya*, 108 D.P.R. 663 (1979).

Ahora bien, en aras de proteger el interés social en un adecuado funcionamiento de los tribunales, no es necesario ampliar el ámbito de la inmunidad judicial con respecto a errores de hecho o de derecho para incluir actuaciones dolosas, fraudulentas, maliciosas o delictivas en que incurran los jueces en el descargo de la función judicial. En el amplio ámbito del Art. 1802 del Código Civil pueden conciliarse los intereses sociales en conflicto: el interés en que los jueces puedan descargar la función judicial sin temor a pleitos viciosos y el interés de disuadir la actuación judicial maliciosa o corrupta y de que se repare el daño así causado. Puede lograrse un balance armonioso entre ambos intereses permitiendo la acción civil contra el juez, después que el acto malicioso por el cual se reclama haya conducido a una condena penal firme por constituir dicho acto un delito, o cuando haya redundado en la destitución del juez, bien mediante resolución firme de este Tribunal, si el juez involucrado formaba parte del tribunal de primera instancia, o bien como resultado del pro-

ceso constitucional de residenciamiento, si se trataba de un juez de este Foro. Art. V, Sec. 11, Constitución del Estado Libre Asociado de Puerto Rico.

El Código Penal tipifica como delito toda una serie de acciones por las que un juez, de incurrir en ellas, queda sometido al rigor de la ley penal. (3) Probado el delito, es obvio que ya no hay un interés social que sea necesario proteger y que justifique privar al perjudicado de una acción para exigir resarcimiento. Eliminada así la posibilidad de que la reclamación sea frívola, no hay razón válida para denegar el ejercicio de la causa de acción.

---

(3) Véanse sólo a modo de ejemplo las siguientes:

"Toda persona que, de cualquier modo, restringiere ilegalmente la libertad de otra, con conocimiento la víctima de la restricción será sancionada con pena de reclusión por un término que no excederá de seis meses o multa que no excederá de quinientos dólares, o ambas penas a discreción del Tribunal." Art. 130 (33 L.P.R.A. sec. 4171).

"Será sancionado con pena de reclusión por un término mínimo de un año y máximo de quince años todo funcionario o empleado público, o jurado, o árbitro, o cualquier persona autorizada en ley para oír o resolver alguna cuestión o controversia, que solicite o reciba, directamente o por persona intermedia, para sí o para un tercero, dinero o cualquier beneficio, o aceptare una proposición en tal sentido, por realizar un acto regular de su cargo o función." Art. 209 (33 L.P.R.A. sec. 4360).

"Si el funcionario o empleado público, o jurado o árbitro, o la persona autorizada en ley para oír o resolver una cuestión o controversia, solicitare, o recibiere el dinero, o el beneficio, o aceptare la promesa, por omitir o retardar un acto regular de sus funciones o por ejecutar un acto contrario al cumplimiento regular de sus deberes, o con el entendido o en la inteligencia de que tal remuneración o beneficio habrá de influir en cualquier acto, decisión, voto o dictamen de dicha persona en su carácter oficial, la pena de reclusión será por un término mínimo de un año y máximo de veinte años." Art. 210 (33 L.P.R.A. sec. 4361).

"Será sancionado con pena de reclusión por un término mínimo de un año y máximo de cinco años todo jurado o persona sorteada o citada como tal, o todo juez, magistrado, árbitro o persona autorizada por ley para oír y resolver una cuestión o controversia que:

"(a) Prometiere o acordare pronunciar un veredicto o decisión a favor o en contra de una de las partes; o

"(b) Admitiere algún libro, papel, documento o informe relativo a cualquier causa o asunto pendiente ante ella, excepto en el curso regular de los procedimientos." Art. 245 (33 L.P.R.A. sec. 4441).

Por otro lado, la conducta inmoral, impropia o reprensible de un juez del tribunal de primera instancia, es motivo de destitución. Art. 24, Ley de la Judicatura del Estado Libre Asociado de Puerto Rico, 4 L.P.R.A. sec. 232. Probados los cargos y destituido un magistrado, ¿cuál es el interés social en que el damnificado permanezca aún sin compensación? En este punto se desvanece cualquier objeción fundada en que la iniciación de pleitos frívolos imposibilitaría el descargo de la función judicial. Una querella frívola contra un juez no rebasaría la etapa de investigación y de determinación de causa, prevista por ley como paso previo a la iniciación de un procedimiento de destitución. Art. 24, *supra*, incisos (a) y (b), 4 L.P.R.A. sec. 232(a) y (b). De igual forma, nuestra Constitución dispone que cualquier juez de este Tribunal Supremo podrá ser residenciado por traición, soborno, cualquier delito grave y cualquier delito menos grave que implique depravación moral. Art. V, Sec. II; Art. III, Sec. 21. Separado de su cargo un magistrado del Tribunal Supremo, ningún motivo existe para que permanezca inmune y se niegue compensación a cualquiera que hubiese perjudicado su corrupción.

No existe en tales supuestos, razón alguna de política pública o de orden social que trabe la eficacia y el rigor del Art. 1802 del Código Civil. Debidamente protegida la función judicial, y claramente delimitados los supuestos de operación de dicha norma, no puede haber reparo alguno en su aplicación. Sostener, por el contrario, que ni aun en esos casos procede el resarcimiento de los daños causados, provocaría en nuestro ordenamiento la injustificable incongruencia de colocar precisamente a aquellos llamados a hacer justicia, completamente al margen de esa norma tan fundamental de nuestro derecho, que impone a todo aquel cuya culpa o negligencia cause daño, el deber de repararlo.

En resumen, rechazamos incorporar a nuestro ordenamiento la doctrina de inmunidad judicial absoluta, y reconocemos como norma de excepción, bajo el Art. 1802 del Código

Civil, la responsabilidad civil de jueces por las actuaciones maliciosas o corruptas en el desempeño de la función judicial.

Conforme lo anteriormente expuesto, la causa de acción que aquí reconocemos no podrá ser ejercitada por la parte agraviada, a menos que los actos que le sirven de fundamento hayan dado motivo a una condena penal firme por constituir dicho acto un delito, o hayan redundado en la destitución del juez mediante resolución firme de este Tribunal, si el juez involucrado formaba parte del tribunal de primera instancia, o como resultado de un proceso constitucional de residenciamiento, si se tratara de un juez de este Tribunal.

*No habiéndose cumplido con dichos requisitos en el presente caso, se dictará sentencia en que se ordene la desestimación de la demanda.*

El Juez Asociado Señor Díaz Cruz emitió opinión disidente a la cual se unen los Jueces Asociados Señores Rigau e Irizarry Yunqué. El Juez Asociado Señor Negrón García se une a la opinión del Tribunal y emitió opinión separada.

—O—

Opinión disidente del Juez Asociado Señor Díaz Cruz a la que se unen los Jueces Asociados Señores Rigau e Irizarry Yunqué.

San Juan, Puerto Rico, a 7 de enero de 1981

La mejor tradición jurídica de los pueblos libres acoge en su decurso de historia un principio y un privilegio que es timbre de la fe del pueblo en la justicia, signo externo del concepto de hombría de bien, de intachable imparcialidad, de honestidad a toda prueba que enaltece la figura del juez: el principio de inmunidad absoluta contra la acción civil de daños por actos realizados en el ejercicio de su jurisdicción. Está fundado en la aspiración y en la confianza de que sólo lleguen a la magistratura los hombres sin mancha, que la judicatura es el final baluarte de libertad y del Derecho y

que por tener tan altas cualidades sus integrantes, resulta extremadamente improbable que sus miembros traicionen su ministerio y la confianza pública tornándose truhanes; y por el convencimiento de que una judicatura corrupta marca la extinción de la fibra moral de un pueblo que no podrá restituirse concediendo a los perjudicados una acción para resarcirse en dinero. Cuando se desplome la tradición y se vulnere el concepto público que la sostiene, ¿qué apoyo moral del pueblo quedará para los que se sientan a juzgar los jueces, si nada podrá evitar que se mire a los juzgadores como otros tantos truhanes cuya podredumbre no ha sido expuesta? De ahí que quitar a la judicatura este secular privilegio es negar e impugnar su tradición de pureza, es alimentar la desconfianza del pueblo en sus jueces porque de ningún otro modo tomaría nuestra sociedad un pronunciamiento de tan enormes consecuencias disolventes. Que unos escritores de revistas y estudiosos cuya vida discurre en el apacible, y también enajenado mundo de su gabinete, censuren el principio de inmunidad, no debe movernos a los que conocemos el torrente vital de la sociedad puertorriqueña, porque los pueblos ni se gobiernan ni se educan con dogmas y abstracciones; como no ha movido la centenaria jurisprudencia inglesa y norteamericana que en profunda percepción del problema social y jurídico está firme en la convicción de que el intento de curar una judicatura enferma con un remedio de acción civil privada, hundida la institución en el descrédito, es menos que aplicar hielo a los labios de un moribundo.

¿Cómo explicarse el pueblo la acción de este Tribunal despojando nuestros jueces de un privilegio de tan firme entronque que prendió hace más de cien años[1] en la jurisprudencia más celosa de la igual protección de las leyes y demás derechos fundamentales del hombre y que se ha extendido en nuestros días para proteger a otros funcionarios que, sin ser

---

[1] Desde *Bradley* v. *Fisher*, 13 Wall. 335, 357 (1871) hasta *Supreme Court of Va.* v. *Consumers Union*, 446 U.S. 719 (1980).

jueces, tienen una limitada intervención en el proceso decisional, como los oficiales examinadores y los abogados a cargo de presentar la prueba en vistas administrativas?

La supresión de este atributo de los jueces enervaría moralmente la institución que por desarrollo constitucional y afirmación en la opinión pública es el final e irreductible baluarte del régimen de ley y, en el lenguaje del Juez Hand, *infra,* "desalentaría el entusiasmo de todos salvo los más firmes, o los más irresponsables". El pueblo le negará a la judicatura la porción de respetabilidad que le quita el Tribunal Supremo.

El demandante recurrido y su familia dedujeron acción civil de daños y perjuicios contra Pablo Matos, Juez de Paz de Toa Alta, y la sociedad de gananciales por éste constituida con su esposa a quien designan como "Fulana de Tal" reclamándoles $42,000.00 de indemnización por daños morales y $5,000.00 de honorarios de abogado, aduciéndose como razón de pedir que el 6 de febrero de 1978 el Juez de Paz, en relación con denuncia presentada ante el Tribunal de Distrito, Sala de Corozal, expidió orden de arresto contra Feliciano Rosado por infracción de la Ley de Depósitos de Chatarra que es la Núm. 125 de 27 de junio de 1966 (10 L.P.R.A. sec. 971 y ss.) por haber dejado abandonado en la vía pública chatarra consistente en la carrocería de un automóvil Volkswagen desmantelado; que el demandante fue arrestado el 10 febrero, 1978; que con posterioridad al mes de abril siguiente, en que su abogado formuló moción de desestimación bajo la Regla 64 de Procedimiento Criminal, invocando violación de su derecho a juicio rápido, y de haber solicitado devolución de la fianza provisional depositada, vino en conocimiento de que se le había arrestado "por una Orden de Arresto dirigida a otra persona", sin haber cometido delito y se le violaron sus derechos civiles; y que la orden de arresto fue "instigada, diligenciada, aconsejada y dictada" por el juez a sabiendas de que se arrestaría al demandante.

El Tribunal Superior denegó la moción para desestimar del demandado, fundada ésta en el principio de inmunidad judicial y prescripción; recurrió el juez en *certiorari* y habiendo el demandante presentado escrito de oposición procedemos a resolver a tenor de la Regla 50 de nuestro Reglamento.

En la decisión clásica del Tribunal Supremo de los Estados Unidos en *Bradley* v. *Fisher*, 13 Wall. 335, 357 (1871), se proclamó principio de capital importancia para la correcta administración de justicia que el juez, al ejercer la autoridad de que está investido, esté libre para actuar según sus propias convicciones, sin aprehensión por las consecuencias personales que contra él se vuelvan. El magistrado que realiza un acto judicial para el cual tiene jurisdicción no estará sujeto a acción civil exigiéndole responsabilidad "no importa cuán errónea su actuación, y cuán perjudicial haya resultado en sus consecuencias para el demandante". *Bradley*, supra, pág. 347.

Esta inmunidad contra responsabilidad civil de los jueces no se afecta por los motivos que dirigen sus actos judiciales, ni puede la pureza de su motivación ser objeto de encuesta judicial. De lo contrario no habría juez, por más sincero y recto, que no estuviese expuesto a la difamación y caería la justicia en una sima de escándalo y desprestigio.

En el desempeño de su alta encomienda los jueces no responden a litigantes privados, y sí únicamente al pueblo a través de los organismos de autoridad del Estado con facultad para disciplinarlos. Si en el ejercicio de sus poderes incurrieren en parcialidad, malicia, corrupción o arbitrariedad u opresión, serán llamados a responder a cargos de residenciamiento, y suspendidos o removidos de su puesto. (²) La inmu-

---

(²) La Constitución provee el recurso de Derecho público contra la conducta impropia de los jueces. Su Art. V, Sec. 11, ordena: "Los jueces del Tribunal Supremo podrán ser destituidos por las causas y mediante el procedimiento que esta Constitución establece en la sección 21 del Artículo III. Los jueces de los demás tribunales podrán ser destituidos por el Tribunal Supremo por las causas y mediante el procedimiento que se disponga por ley."

nidad del juez se relaciona con la jurisdicción y si ninguna tuviere no tendrá protección. Pero si la tuviere sobre la materia, no responderá aun cuando sus actos se produzcan en exceso de jurisdicción y aunque se alegue que están teñidos de malicia y corrupción.

La razón de la inmunidad del juez contra la acción civil privada hay que buscarla en la esencia misma de la función judicial. El juez es árbitro por excelencia en los conflictos en que se debaten el derecho a la vida, a la libertad y a la propiedad. Cuando a él llega la controversia quedan atrás todos los recursos y esfuerzos para la solución armónica, para la avenencia conciliatoria; las partes se hallan en posiciones endurecidas, cada una convencida de que el Derecho y la justicia le corresponden. Un fallo en contra será tomado por el perdidoso en numerosas ocasiones como parcialidad del juez hacia la parte victoriosa, a un paso de la sospecha seguida de imputación de corrupción, cohecho e intención maliciosa. El reposo intelectual necesario para una decisión que no responda a otra fuerza que la conciencia libre del juzgador no se concibe sintiéndose en el centro donde chocan intereses, ambiciones y pasiones, expuesto a que esa vorágine lo envuelva y que sea llevado como demandado ante otro juez y obligado a revalidar su integridad y honradez. La posibilidad de acción civil de una parte contra el juez es un elemento perturbador de la suprema independencia del magistrado, tan detestable invasor de la libertad de conciencia judicial como la llamada telefónica amenazando violencia, o la persecución política. (3)

---

(3) Se han resumido así las razones que justifican la política pública de inmunidad judicial: (1) evitar que la amenaza de pleito influya en la decisión; (2) proteger los jueces de responsabilidad por errores de buena fe; (3) librarlos del gasto y tiempo en defenderse de demandas; (4) quitar un impedimento a la entrada de hombres responsables a la judicatura; (5) necesidad de finalidad; (6) adecuacidad del remedio de revisión apelativa; (7) responsabilidad de los jueces al público, y no a individuos; (8) autoprotección de la judicatura y (9) separación de poderes. Juez Douglas en *Pierson* v. *Ray*, 386 U.S. 547, 564 (1967), esc. 4.

La razón del privilegio fue admirablemente expuesta por el Juez Learned Hand:

Ciertamente está demás decir que un funcionario, de hecho culpable de usar su poder para descargar su rencor sobre los demás, o para cualquier otro fin personal ajeno al bien común, no debiera escapar de responsabilidad por los daños que así cause; y, si en la práctica fuera posible limitar tales querellas a los culpables, sería monstruoso denegar el resarcimiento. La justificación para en efecto denegarlo radica en que es imposible saber si la reclamación está bien fundada hasta que el caso se adjudica; y en que someter a todo funcionario, tanto al inocente como al culpable, al rigor de un juicio y al inevitable riesgo de su resultado, desalentaría el entusiasmo de todos salvo los más firmes, o los más irresponsables, por el decidido descargo de sus deberes. Una y otra vez el interés público exige que se tome acción que podría resultar fundada en el error, confrontada con la cual podría encontrarse luego un oficial en difícil posición de convencer a un jurado de su buena fe. Sin duda debe haber medios para castigar a los funcionarios públicos que han traicionado sus deberes; pero eso es cosa enteramente distinta a exponer a aquellos que honestamente han errado al reclamo de cualquiera que haya sufrido por sus errores. Como tan a menudo ocurre, la solución ha de encontrarse en un balance entre los inevitables males de una u otra alternativa. En este caso se ha pensado a la postre dejar mejor sin resarcir los daños causados por oficiales deshonestos, que someter a aquellos que tratan de cumplir con su deber al constante temor de la represalia. *Gregoire* v. *Biddle* 177 F.2d 579, 581, según citado en *Ferri* v. *Ackerman,* 444 U.S. 193, 203–204, esc. 20; 62 L.Ed.2d 355 (1979).

El juez no debe vivir con más preocupación que el temor a equivocarse porque éste no enerva, sino que acrecienta y afina su facultad estimativa de lo justo, y lo mantiene en interminable esfuerzo de superación de las imperfecciones humanas. La inmunidad del juez contra acciones civiles en daños y perjuicios es condición vital de su libertad e independencia y premisa medular del ideal de justicia, eterna aspiración del hombre.

La necesidad de que quien decide conflictos entre personas, en cualquier campo de actividad, se sienta libre para dar su

laudo fue destacada por este Tribunal en el caso de un árbitro deportivo donde dijimos:

Los que en nuestra sociedad ejercen la facultad de decidir controversias similar a la conferida a los jueces de derecho, han de sentirse libres de aprehensión en todo momento de que sus dictámenes y veredictos puedan provocar reacciones punitivas de las partes afectadas, o de sector alguno. . . . La decisión del árbitro encarna la regla de derecho de dar a cada uno lo que es suyo. Cuando se emite bajo la influencia del miedo, del favor o el castigo, se pierde la esencial pureza y objetividad y queda abolida su utilidad de poner fin al conflicto en nuestro sistema político de continua contraposición de intereses, lucha y pugna de éstos. *Gallera de P.R., Inc.* v. *Tribunal Superior,* 103 D.P.R. 173, 174 (1974).

Al expedir orden de arresto contra el ahora demandante en daños el juez de paz demandado actuó con plena jurisdicción, en ejercicio de la autoridad judicial que incluye su función y facultad de fijar y aprobar fianzas y de expedir órdenes de arresto y de registro y allanamiento, 4 L.P.R.A. sec. 202. *Pueblo* v. *Sánchez Vega,* 97 D.P.R. 133 (1969). La inmunidad que le protege de la acción civil no cede a la alegación en la demanda de que violó los derechos civiles del demandante al actuar "intencionalmente y a sabiendas de que se arrestaría y habían arrestado a una persona diferente y sabiendo que así se efectuó el arresto, nada hizo para impedir y evitar que el Sr. Francisco Feliciano Rosado fuera arrestado y encarcelado". La encuesta para determinar si el juez demandado es inmune a la acción civil se reduce a si al tiempo de su actuación impugnada tenía jurisdicción sobre la materia en el asunto ante él. Tomando en cuenta que entre las más difíciles y embarazosas cuestiones que un funcionario judicial está llamado a considerar y decidir se encuentran aquéllas relacionadas con su jurisdicción, "el ámbito de la jurisdicción del juez debe concebirse con amplitud cuando se cuestiona su inmunidad. El juez no será despojado de su inmunidad porque su actuación haya sido errónea, maliciosa o en exceso de

autoridad; por el contrario incurrirá en responsabilidad únicamente cuando actúe en 'clara ausencia de toda jurisdicción' [*Bradley* v. *Fisher*, 13 Wall., a la pág. 351]". *Stump* v. *Sparkman*, 435 U.S. 349, 356 (1978).

El arraigo de esta doctrina de inmunidad judicial pasa su más fuerte prueba al confrontarla con la Ley de Derechos Civiles de 1871 (42 U.S.C. sec. 1983) (⁴) en *Pierson* v. *Ray*, 386 U.S. 547 (1967). Demandado un juez de policía municipal porque sentenció a cuatro meses de cárcel a unos ministros negros activistas que intentaron comer en un restaurant segregado de Mississippi, y de cuyo cargo fueron exonerados en apelación, reafirmó el Tribunal Supremo de los Estados Unidos el principio de que el juez no responde en daños por actos realizados dentro de su jurisdicción judicial, citando a *Bradley* v. *Fisher*, ante, y resolviendo que el bien establecido principio de derecho no fue abolido por la Sec. 1983 que responsabiliza "toda persona" que so color de autoridad priva a otra de sus derechos civiles. Sentenció el Supremo federal: "Esta inmunidad aplica aun cuando se acuse al juez de actuar maliciosa y corruptamente y no opera 'en protección o provecho del juez malicioso o corrupto, sino para beneficio del público, cuyo interés radica en que los jueces se hallen en libertad de ejercer sus funciones con independencia y sin miedo a las consecuencias. . . . Imponer a un juez la carga [de responder a pleitos privados por sus errores] en nada contribuiría al proceso decisional honesto y valiente, sino a la intimidación.' " *Pierson* v. *Ray*, citado, pág. 554.

El ya clásico principio de inmunidad de los jueces expuesto en *Bradley* v. *Fisher*, supra, en 1871, recibió reciente

---

(⁴) Sec. 1983.—Civil Action for Deprivation of Rights.

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

ratificación en *Stump* v. *Sparkman*, 435 U.S. 349 (1978), donde se desestimó la acción civil al amparo de la citada 42 U.S.C. sec. 1983 promovida por una mujer casada infecunda contra el juez que cuando ella tenía 15 años y era "algo retardada", a petición de su señora madre autorizó la esterilización que a la joven se le representó como apendectomía. Concluyó el Supremo federal que la aprobación de la solicitud de la madre a pesar de la informalidad del trámite y la ausencia de debido proceso[5] fue un acto judicial dentro de la jurisdicción general del Juez Stump para conocer de asuntos de menores. Sostuvo el Supremo que "un juez tiene inmunidad absoluta contra responsabilidad por sus actos judiciales aun cuando el ejercicio de su autoridad esté matizado por la comisión de graves errores procesales". Pág. 359. Y regresando a *Bradley*, 13 Wall., a la pág. 357, 20 L.Ed. 646, citó: "Este modo erróneo en que se ejercitó la jurisdicción, comoquiera que haya afectado la validez del acto, no lo hacía menos un acto judicial; ni sujetaba al demandado a responder en daños y perjuicios por el dicho acto en el pleito del demandante, como si el tribunal hubiese procedido sin ninguna clase de jurisdicción . . .". *Stump*, supra, pág. 359.

Y afirmando la doctrina el Supremo federal en *Butz* v. *Economou*, 438 U.S. 478, 508–509 (1978), se expresó así: "En *Bradley* v. *Fisher*, supra, esta Corte analizó la necesidad de inmunidad absoluta para proteger los jueces de pleitos en que se alega que sus decisiones están teñidas por motivaciones impropias. La Corte empezó por recordar que el principio de inmunidad para actos de los jueces 'en el ejercicio de sus funciones judiciales' ha sido 'la firme doctrina de las cortes de Inglaterra por muchos siglos, y jamás ha sido negada, que tengamos conocimiento, en las cortes de este país.' 13 Wall.,

---

[5] La petición no recibió número de radicación, ni fue archivada en secretaría; fue aprobada ex parte sin notificar a la menor, sin vista ni designación de defensor judicial. El relieve sentimental de *Stump* ha levantado una polvareda de crítica, con olvido de que un caso aislado no puede derrotar un buen principio.

pág. 347. Explicó la Corte que el valor de esta regla se había probado en la experiencia. Los jueces con frecuencia son llamados a decidir '[c]ontroversias que envuelven no sólo grandes intereses económicos, sino la libertad y la reputación de las partes, y que en consecuencia agiten las más hondas emociones.' *Id.*, pág. 348. Tales adjudicaciones invariablemente producen por lo menos una parte perdidosa, que está dispuesta a 'aceptar todo menos la corrección de la decisión como explicación de lo actuado por el juez' *Ibid.* 'Justo en proporción a la fuerza de sus convicciones sobre lo correcto de su propio punto de vista en el caso, será su aptitud para protestar el fallo en su contra, y de la protesta pasar a la atribución de motivaciones impropias al juez.' *Ibid.* Si pudiera entablarse acción civil contra un juez predicada en una alegación de malicia, los jueces perderían 'esa independencia sin la cual ninguna judicatura es respetable o útil.' *Id.*, pág. 347. De modo que se declaró a los jueces inmunes a acción civil 'por malicia o corrupción en sus actuaciones durante el ejercicio de sus funciones judiciales dentro del ámbito general de su jurisdicción.' *Id.*, pág. 354." *Cf. Dennis* v. *Sparks*, 445 U.S. 942 (1980).

A pesar de una gran tradición de libertad y de derechos individuales, las cortes inglesas y las norteamericanas han preferido proteger como valor más alto la serenidad y la dignidad de sus jueces aunque ello signifique negar al perjudicado por una actuación venal el resarcimiento de sus daños y perjuicios. Pues ¿qué significan los derechos fundamentales del hombre declarados y preservados en la Constitución y en las leyes, si el juez llamado a insuflarles vida y eficacia ha de vivir perturbado a cada instante, en sus innumerables intervenciones con personas de toda clase y carácter, por una falsa imputación de parcialidad y cohecho capaz de desencadenar un proceso de destitución y hasta acusación criminal con adicional incentivo de compensación económica para el autor de la trama? El demandante contra el juez no esperaría a la

adjudicación de su querella para iniciar la acción civil que en ausencia de legislación especial tendría la prescripción de las acciones bajo el Art. 1802, por lo que es ilusorio pensar que el juez disfrutaría de inmunidad limitada hasta que recaiga decisión final, administrativa o judicial, en los procedimientos correctivos. Temprano en el pleito tendrá que someterse a deposición mediante examen oral y a los demás recursos de descubrimiento y aseguramiento de efectividad de sentencia. Nos parece claro que con tan repugnante perspectiva la deserción de nuestros mejores jueces será, en toda su gravedad, consecuencia de menor impacto en la estabilidad y la dignidad de la judicatura.

Un juez con miedo es una figura trágica de colapso y derrota. El temor, aun dictado por remotas posibilidades, hiere de muerte la objetividad esencial del juzgador e inyecta, hasta inconscientemente, elementos de disolución y degradación en la función decisional. Difícilmente exista en el mundo una judicatura con mejor tradición de honestidad, pulcritud e imparcialidad que la nuestra. Esos atributos se ganaron en el pasado y se conservan al presente en un medio de estrechez económica por sobre la cual se impone la auténtica vocación de estos servidores públicos. La tradición jurídica de los Estados Unidos muestra indeclinable celo por la doctrina de inmunidad judicial, de secular entronque en su jurisprudencia. El ejemplo es aleccionador, proviniendo de una jurisdicción que ha abierto sus puertas como ninguna otra a toda variedad de reclamaciones por discrimen o arbitrariedad y que ha expandido a confines hasta ayer impredecibles los recursos y medios para propiciar esa eclosión de los derechos personales. (6) La preocupación constante de su

---

(6) Desarrollo que en sus más recientes manifestaciones cuenta a *Branti* v. *Finkel,* 445 U.S. 507 (1980), casi aboliendo el patronazgo político al extender permanencia a los empleados de confianza; y *Owen* v. *City of Independence,* 445 U.S. 622 (1980), que releva al demandante bajo 42 U.S.C. sec. 1983 de probar mala fe en la actuación del funcionario público. *Id. Gómez* v. *Toledo,* 446 U.S. 635 (1980).

jurisprudencia por mantener su judicatura libre de todo tipo de presiones, reales o potenciales y aun imaginarias, se ha extendido a otros funcionarios que sin ser jueces de derecho común, sí intervienen y adjudican en un proceso decisional. El Tribunal Supremo federal acaba de extender inmunidad absoluta a los jueces administrativos, a los oficiales examinadores y al abogado de la agencia encargado de presentar evidencia en la vista. *Butz* v. *Economou*, supra. Ya antes dio igual protección a los fiscales. *Yaselli* v. *Goff*, 275 U.S. 503 (1927), confirmado en *Imbler* v. *Pachtman*, 424 U.S. 409 (1976). También la tienen los legisladores, tanto federales como estatales. *Eastland* v. *United States Servicemen's Fund*, 421 U.S. 491, 502–503 (1975); *cf. In re Rodríguez Torres*, 106 D.P.R. 698, 705 y ss. (1978). El más reciente caso de *Supreme Court of Va.* v. *Consumers Union*, 446 U.S. 719, (1980), ratifica el principio de inmunidad judicial absoluta, extendiéndolo a la función *legislativa* de la Corte al promulgar reglas.

Nuestros jueces, de irreducible tradición de honor, sacrificio personal y dedicación honesta a su ministerio, no deben quedar excluidos de la prestigiosa doctrina de inmunidad en la plena extensión elaborada por el Tribunal Supremo de los Estados Unidos. Si el Juez Learned Hand la justificó con su conclusión de que es preferible dejar a algún litigante sin resarcimiento que someter los puros al constante temor de represalia, (7) menos puede este Tribunal regatear este escudo de dignidad a la judicatura patria cuyo historial no muestra ni siquiera aquella exigua minoría pecaminosa.

El propósito que nos mueve a extender inmunidad total a los jueces, no es proveer un escudo para los prevaricadores y corruptos, pues éstos ni siquiera se dan en nuestra familia judicial, sino quitar de la mente y el ánimo de los buenos jueces la preocupación de que puedan ser falsamente impu-

---

(7) *Gregoire* v. *Biddle*, ante.

tados de corrupción con el fin avieso de no solo lograr su destitución, sino también su ruina económica.

La protección que brinda la inmunidad a los jueces debe ser absoluta si es que ha de impedir la distracción y la desviación de su tiempo, energía y atención de las funciones judiciales hacia la defensa de litigación. *Cf. Eastland* v. *United States Servicemen's Fund,* supra, pág. 503. De desaparecer la inmunidad absoluta, nada podrá detener la mano del litigante vicioso. Es remedio ilusorio por antijurídico contra reclamaciones frívolas, posponer la acción civil por daños hasta que recaiga decisión final y firme en el proceso criminal o en el de destitución, toda vez que a tenor de las cláusulas de debido proceso e igual protección de las leyes la persona agraviada por la conducta del juez tiene derecho a ejercitar la acción desde el momento mismo en que ocurre la actuación lesiva, o desde que el demandante se entera de la misma, regulada por el estatuto de prescripción. Art. 1868(2) del Código Civil, 31 L.P.R.A. sec. 5298.(⁸) La inaceptable posposición también negaría al juez la protección del término de prescripción que aplica por igual a todo demandado bajo el Art. 1802 del Código o la legislación sobre derechos civiles. La prescripción no se interrumpe por procedimientos administrativos o judiciales coetáneos a la acción por daños. *Graffals González* v. *García Santiago,* 550 F.2d 687 (1977); *Ramírez de Arellano* v. *Alvarez de Choudens,* 575 F.2d 315 (1978); *Cortés* v. *Valdés,* 43 D.P.R. 192 (1932).(⁹) Este Tribunal carece de facul-

---

(⁸) Sec. 5298. *Acciones que prescriben al año*

"Prescriben por el transcurso de un año:

"1.     .     .     .     .     .     .     .

"2. La acción para exigir la responsabilidad civil por injuria o calumnia, y por las obligaciones derivadas de la culpa o negligencia de que se trata en la sec. 5141 de este título desde que lo supo el agraviado."

(⁹) En *Cortés* v. *Valdés,* supra, este Tribunal resolvió que un empleado destituido y privado de su propiedad no debió esperar a que se adjudicara su derecho en apelación antes de promover la acción civil por daños y perjuicios; que el término prescriptivo no se interrumpió por el pleito relativo al despido y que siendo la destitución del demandante el funda-

tad para demorar el ejercicio por un demandante de su causa de acción basada en el Art. 1802 del Código Civil y para ampliar los plazos de prescripción.

En una sociedad de proclividad efervescente hacia las reclamaciones de indemnización que agota los horizontes del Art. 1802, ¿qué serenidad, qué paz íntima puede albergar un juez que se sabe expuesto en cada caso, en cada incidente que interviene, a cargos de cohecho y prevaricación con el atractivo adicional de compensación monetaria para el promovente? El honor es el principal patrimonio del juez, y desgraciadamente la reputación se hiere y se lesiona con gran indiferencia en nuestros días. El juez recto y sabio, acosado por la angustia económica, por las alternativas políticas, por la exposición tanto propia como de su familia a la violencia de los juzgados y aun por la soledad que impone su ética no debe sufrir la carga adicional de una constante expectativa de verse demandado por sus detractores. Sobre el mismo fundamento jurídico y filosófico, el Prof. Tribe se adhiere al criterio del Supremo federal y del Juez Hand, aun cuando censura la conducta del juez en *Stump* v. *Sparkman*, ante, y sostiene:

A pesar del resultado injusto que a veces se produce, dicha inmunidad judicial se considera esencial a la existencia de una judicatura independiente: los jueces "no deben estar sometidos al temor de que litigantes insatisfechos puedan hostigar[los] con pleito imputándoles malicia o corrupción. Imponer semejante carga a los jueces contribuiría, no al proceso decisional bien fundado y valiente, sino a la intimidación." Tribe, *American Constitutional Law*, Supl. 1979, pág. 4.

---

mento de la acción, "[u]na causa de acción surgió inmediatamente en su favor por cualesquiera daños que él pudiera haber sufrido por su destitución, ya fueran directamente calculables o por los daños a su reputación en la comunidad". Pág. 194.

En los casos federales citados de *Graffals González* y *Ramírez de Arellano*, se aplica la regla de prescripción del Art. 1868(2) del Código Civil a las acciones bajo la Ley de Derechos Civiles, y como en *Cortés* v. *Valdés* se sostiene que la pendencia de arbitraje o procedimientos en la Junta de Personal no suspenden el término de prescripción.

Y a su vez Davis, [10] que al igual que Tribe fue en una ocasión reclamado por la mayoría como autoridad para su posición, expone que las cortes confrontan el dilema de "dejar un demandante meritorio sin remedio o imponer responsabilidad personal al funcionario o empleado, que por lo general o está mal provisto para sufrir la pérdida, o realiza ese tipo de función que puede llevarse a cabo únicamente si el funcionario se siente libre de toda preocupación por su patrimonio. El interés público en una administración libre de temores está en primer lugar, de modo que los funcionarios deben estar inmunes a responsabilidad . . . .; cuando esto ocurre el único medio adecuado de compensar a un demandante de méritos, es imponer responsabilidad a la agencia gubernamental. Cuando el pueblo recibe el beneficio de un programa, el pueblo debe pagar por los perjuicios que irrogue su implementación. *La única solución satisfactoria para muchos problemas de responsabilidad de funcionarios y empleados es indemnizar al demandante, pero manteniendo la inmunidad del funcionario o empleado*". (Énfasis del autor.) Davis, *op. cit.*, (Suplemento 1980) pág. 242.

Sostiene Davis que las razones para suprimir pleitos de personas perjudicadas contra funcionarios o empleados públicos tienen mayor validez hoy (pág. 244) y reconoce que "la mayor razón para la inmunidad es que de lo contrario se estaría desalentando a funcionarios escrupulosos de tomar las decisiones necesarias para proteger el interés público". (Pág. 244.) Nótese que Davis trata sobre funcionarios administrativos, no jueces, y aun así justifica la inmunidad absoluta de aquéllos porque su reducción tiene "un potencial de desquiciamiento del Gobierno". Por tanto, la cita de Davis introducida originalmente como "luminosa" por la mayoría inclina su luz hacia el principio de inmunidad.

Al privar y aislar a los jueces de la inmunidad clásica absoluta, la mayoría los coloca en situación de inferioridad

---

[10]*Administrative Law Treatise,* Supl. 1980, págs. 242–244.

a los miembros del panel de arbitraje que juzgan causas bajo la Ley de Seguro de Responsabilidad Profesional Médico-Hospitalaria, para los que expresamente se ordena tal inmunidad. 26 L.P.R.A. sec. 4113(7). Arraigado como está en nuestra legislación fundamental el principio de la independencia judicial, no tardará la acción de la Asamblea Legislativa corrigiendo el discrimen y restituyendo a nuestros jueces la inmunidad que es elemento inseparable de su libertad de decisión.

El principio de inmunidad no coloca al juez sobre la ley; más bien coloca la justicia fuera del alcance de la litigación viciosa y preserva su integridad, aun a costa de negar reparación pecuniaria en los raros y excepcionales casos en que un juez convierta su poder en instrumento de opresión, corrupción y abuso. Porque los valores envueltos sean tan altos no ha de permitirse que sufra el inocente tanto como el culpable.

Debió expedirse el auto y dictarse sentencia de conformidad anulando la resolución recurrida y desestimando la demanda.

—O—

Opinión particular del Juez Asociado Señor Negrón García.

San Juan, Puerto Rico, a 7 de enero de 1981

Al suscribir la opinión mayoritaria del Tribunal, considero de rigor plasmar la siguiente reflexión sobre política (*policy*) judicial. No se adelanta la causa de la judicatura y el respeto a su independencia funcional, tejiendo de la toga judicial un manto de inmunidad legal absoluta. Quien la deshonra con su indignidad no es acreedor a tal invulnerabilidad. En nuestra sociedad nadie, y menos los jueces, están sobre el imperio de la Ley.

La reparación proveniente de conducta inmoral, por depravación o deformación, no puede limitarse a la sola sanción disciplinaria oficial. La justicia, como símbolo y norma remedial, implica para el agraviado una total vindicación.

El prestigio del Poder Judicial queda más hondamente socavado, promoviéndose la idea o creencia errónea de que el magistrado ofensor goza un salvoconducto, aun al egresar de la judicatura.

. . . Las garantías constitucionales de independencia judicial presuponen un ejercicio digno, ponderado y discreto de ese poder. Mientras la Judicatura, por sus propios actos, se mantenga al nivel de dignidad que el pueblo de ella espera, no cabe en los jueces temor ni desasosiego. El desasosiego y el temor cabrían en el pueblo mismo, si la protección a los jueces en la incumbencia de sus cargos —que ciertamente forma parte del conjunto de garantías indispensables para una judicatura independiente— redujera los niveles éticos de la conducta judicial. Ni el pueblo, a través de su Convención Constituyente, ni la Asamblea Legislativa, a través de la Ley de la Judicatura, han auspiciado la transgresión de normas de conducta judicial so pretexto de proteger la integridad de ejercicio de poder político, ni han condonado esa conducta. En ninguna comunidad civilizada, y ciertamente tampoco en la nuestra, prevalece esa escala de valores. *In re Gallardo*, 81 D.P.R. 19, 54–55 (1958).