Voto disidente emitido por el
Juez Presidente Señor Her-nández Denton.
El 14 de junio de 1985 juré que, como miembro de esta Curia, protegería y defendería nuestra Constitución contra todo enemigo interior y exterior. Así lo he hecho durante los casi veintisiete años de servicio que llevo en este Foro, siete de ellos como su Juez Presidente. Así lo seguiré ha-ciendo hasta el 12 de abril de 2014, día en que, con el favor de Dios, alcanzaré los setenta años de vida, edad a la que, por mandato de la Constitución, estaré obligado a retirarme.
El Tribunal Supremo de Puerto Rico es, por diseño cons-titucional, el máximo intérprete de nuestra Constitución. En el cumplimiento de tan delicada función, los Jueces y las Juezas que conformamos esta Curia tenemos el deber legal, asumido mediante juramento, de ser fieles al texto de nuestra Carta Magna, así como a las ideas, los valores y los principios que informaron su adopción por la Conven-ción Constituyente, su ratificación por el Pueblo en las ur-nas y su aprobación por el Congreso de Estados Unidos hace ya seis décadas.
He dedicado gran parte de mi vida profesional al servi-cio público, mayormente a través de mis nombramientos como Juez Asociado y Juez Presidente de este Tribunal. Hoy me honra ser el Juez de más largo servicio en este Alto Foro al amparo de la Constitución del Estado Libre Aso-ciado y el segundo de más largo servicio en la historia de *602 este Tribunal, superado solo por el Juez Wolf, quien sirvió del 1904 al 1940, cuando los Jueces eran nombrados por el Presidente de Estados Unidos. En todo momento, mi norte ha sido brindar justicia a los puertorriqueños y garantizar sus derechos y libertades.
Hago referencia a mi extenso récord de servicio público en este Tribunal con el único propósito de poner en pers-pectiva la situación en que, como miembro y Presidente de esta Corte, hoy me encuentro. Recientemente, nuestro es-tado de derecho recibió un golpe —que ha afectado la legi-timidad y confianza de la ciudadanía en el Tribunal Supremo— con la aprobación de las Resoluciones emitidas durante mi ausencia por cinco compañeros Jueces y una compañera Jueza de este Tribunal, quienes a su vez conta-ron con la oposición de los demás miembros. Como Juez Presidente, es mi deber expresarme sobre el particular. Hoy más que nunca tengo claro mi deber: ser fiel a nuestra Constitución y, de esa manera, protegerla de cualquier in-terpretación contraria a su espíritu.
Mediante las Resoluciones en cuestión, una mayoría de este Tribunal se ha arrogado funciones que la Constitución delega expresamente a la figura del Juez Presidente o de la Jueza Presidenta. Por ello, debo defender la Constitución, no como quien sufre la usurpación de las facultades de un cargo público, sino como defensor del texto constitucional y garante de la seguridad jurídica del país.
Es importante poner esta actuación en perspectiva frente a la situación actual del país. Los retos que hoy en-frentan importantes instituciones, incluido este Foro, pue-den socavar la confianza de la ciudadanía en el estado de derecho. Ese estado de derecho es una condición indispensable para la seguridad jurídica y el bienestar social, polí-tico, democrático y económico de cada puertorriqueño y puertorriqueña. La actuación de una mayoría de este Tribunal cobra mayor trascendencia cuando partimos de la premisa de que, para evitar que el Estado ejerza sus pode- *603 res desenfrenadamente, es necesario sujetar el poder al Derecho. Ello, a su vez, depende de que la Judicatura se adhiera a los postulados claramente definidos por nuestros constituyentes para crear pesos y contrapesos frente a cada acción gubernamental. Si no colocamos el Derecho por encima del poder, los ciudadanos no podrán confiar en que están cobijados —siempre— por la Constitución y sus ga-rantías, y por las decisiones tomadas por este Tribunal.
Habiendo analizado las Resoluciones de epígrafe a la luz de esas circunstancias, vemos que el texto y el historial de nuestra Carta Magna no permiten llegar a otra conclu-sión que no sea que estas Resoluciones son contrarias a la Constitución y atentan contra importantes derechos individuales. Ningún puertorriqueño o puertorriqueña me-rece tener que vivir bajo la amenaza de que, en cualquier momento, sin tan siquiera tener un caso ante sí, este Tribunal pueda dejar sin efecto obligaciones contractuales vá-lidas y arrebatarle su libertad mediante el desacato. Eso es lo que ha ocurrido con la aprobación de esas dos Resoluciones.
Ante ello, he decidido suscribir estas expresiones con respeto pero con firmeza ante una actuación ilegal y arbi-traria tomada apresuradamente por una mayoría del Tribunal sin el beneficio de una profunda reflexión de sus consecuencias sobre la credibilidad y legitimidad de esta institución, en momentos de grandes retos para la seguri-dad y calidad de vida de nuestra ciudadanía.
No olvidemos que, en esencia, la autoridad de este Tribunal depende de la confianza que tenga el Pueblo en nuestras actuaciones. En los últimos años, las acciones de la mayoría de aumentar el número de Jueces y Juezas, de aprobar estas dos Resoluciones y de emitir otras importan-tes decisiones, han transcurrido sin el consenso que histó-ricamente había caracterizado este tipo de decisión y que ahora se han tomado de manera atropellada, invocando la Regla 5(b) del Reglamento de esta Corte, 4 L.P.R.A. Ap. *604 XXI-A. Esto para evitar el debate que debe prevalecer en un foro colegiado. El resultado de esta modalidad de deci-dir asuntos de transcendencia histórica lacera la confianza del Pueblo en nuestras actuaciones. Sin esa confianza nuestra institución decaerá hasta convertirse en un re-cuerdo de la historia constitucional de Puerto Rico.
I
El martes 31 de enero de 2012 se circularon los proyec-tos de las Resoluciones de epígrafe, dirigidas a frenar una investigación administrativa en curso sobre el uso de los recursos de la Rama Judicial. Esas Resoluciones fueron aprobadas atropelladamente, en menos de veinticuatro horas, mientras me encontraba fuera del país en una reunión de la Conferencia de Jueces Presidentes de Estados Unidos y de su Comisión de Acceso a la Justicia, la cual me honro en presidir. Con ese proceder durante mi ausencia, una mayoría impone su criterio —por segunda vez en estos pa-sados dos años— de forma contraria al uso y costumbre en este Foro.(1) Ante asuntos como este siempre se había ac-tuado mediante consenso.
Las Resoluciones en controversia fueron impuestas, de acuerdo con cinco Jueces y una Jueza, al amparo del poder del Tribunal para adoptar reglas para la administración de los tribunales bajo la See. 7 del Art. V de la Constitución de Puerto Rico, Const. E.L.A., L.P.R.A., Tomo 1, pág. 416.
La primera Resolución promulga —por primera vez en nuestra historia— las Reglas para los Procedimientos de In-vestigaciones Especiales Independientes de la Rama Judicial. La segunda Resolución se aprobó en virtud de las referidas reglas y ordena una serie de acciones intrínseca-mente administrativas, a saber: (1) que se “deje sin efecto” un contrato público válido con el Ledo. César López Cintrón, *605 “so pena de desacato” (In re Miembros Com. Esp. Independiente, 184 D.P.R. 507, 508 (2012)); (2) que se investigue la contratación del licenciado López Cintrón por parte de la Directora Administrativa de la Oficina de Administración de Tribunales, así como el “uso de fondos y recursos públicos ... por parte de la OAT y su directora” (id.), y (3) se “prohíbe a la Directora de la Oficina de Administración de los Tribuna-les el desembolso de fondos públicos asignados a la Rama Judicial para el pago de los servicios del licenciado López Cintrón ...” (Énfasis suprimido.) íd.
Antes de exponer los fundamentos de mi disenso, debo señalar el contexto histórico y las circunstancias en que se desarrolla la actuación del Tribunal. A finales del pasado año, un grupo de funcionarios y funcionarías de la Rama Judicial comenzaron una campaña mediática para impul-sar una serie de reclamos sobre mejoras a sus condiciones de empleo. En específico, solicitaron aumentos de sueldo.
Durante ese proceso, siempre reconocí públicamente la validez del reclamo de los trabajadores de la Rama de Go-bierno que me honro en dirigir. Más aún, siempre me he asegurado de garantizar que todos los padres y todas las madres de familia que laboran para el Pueblo de Puerto Rico desde los tribunales conserven su trabajo y sus bene-ficios, a pesar de la difícil situación que han enfrentado los empleados y las empleadas de gobierno en tiempos recientes. De igual forma, siempre he sido consciente de la importancia de garantizar, desde mi cargo de Juez, el de-rechos a la libre expresión de todos los ciudadanos y todas las ciudadanas.
Sin embargo, algunos funcionarios y algunas funciona-rías fueron más allá de la denuncia e intentaron infructuo-samente paralizar los servicios que la Rama Judicial brinda a la comunidad. En reacción a ese comportamiento de obstaculizar la función de los tribunales, que puso en riesgo el aparato de seguridad pública del país, la Oficina de Administración de los Tribunales envió una carta me- *606 diante la cual apercibió a los empleados y a las empleadas que se ausentaron injustificadamente de sus labores, de que habían violado varias normas laborales. Por eso, se les informó que tenían derecho a solicitar una vista informal previa a cualquier posible presentación de cargos administrativos.
Así las cosas, con el ánimo de amedrentar a los admi-nistradores de la Rama Judicial, una de las personas invo-lucradas comenzó una nueva campaña mediática contra este servidor. Esta vez, hizo una serie de imputaciones fal-sas relacionadas a un uso indebido de recursos públicos. En ese momento fui categórico al destacar la mendacidad y falsedad de sus imputaciones. Además, le informé me-diante declaraciones públicas que no me dejaría amedren-tar por reclamaciones que respondían a sus intereses per-sonales ni por ataques abusivos a mi honra y a mi familia, que está ajena a cualquier asunto de interés para dicha persona.
En consecuencia, este acudió ante el Departamento de Justicia y al Senado de Puerto Rico a presentar sus denuncias. Ante las alegaciones sobre el supuesto uso in-debido de recursos públicos, la Oficina de Administración de los Tribunales —oficina llamada a custodiar los recur-sos públicos que se confían a la Rama Judicial— contrató al Ledo. César López Cintrón para investigar el uso de esos recursos. De esa manera, este podría rendir un informe con sus hallazgos y someter recomendaciones.
Su investigación iba dirigida a las alegaciones de ese fun-cionario, a la luz de las expresiones públicas que había hecho. Así surge claramente de la carta enviada por el licen-ciado López Cintrón a la Directora Administrativa —el 2 de febrero de 2012 — , mediante la cual aclaró que su investiga-ción estaba limitada a las alegaciones públicas sobre el uso indebido de recursos públicos. No obstante, la mayoría de este Tribunal optó por imposibilitar el desarrollo de esa in-vestigación por medio de las Resoluciones de epígrafe.
*607 Una vez el Tribunal aprobó dichas Resoluciones, el li-cenciado López Cintrón renunció al contrato y devolvió to-dos los documentos en su poder, sin cobrar honorario alguno. A pesar de que ese hecho, de suyo, tornaría acadé-micas las acciones ordenadas por la segunda Resolución del Tribunal a la Directora Administrativa, la inconstitu-cionalidad y el cambio dramático al estado de derecho me fuerzan a emitir las expresiones siguientes.
i — I I — i
La Sec. 4 del Art. V de la Constitución del Estado Libre Asociado de Puerto Rico establece que “[e]l Tribunal Supremo funcionará, bajo reglas de su propia adopción ...”. Const. E.L.A., L.P.R.A., Tomo 1, ed. 2008, pág. 412. Esa disposición se refiere principalmente al manejo de los asuntos adjudicativos de este Foro judicial. Por su parte, la See. 7 del Art. V de nuestra Constitución dispone que “[e]l Tribunal Supremo adoptará reglas para la administración de los tribunales las que estarán sujetas a las leyes relati-vas a suministros, personal, asignación y fiscalización de fondos, y a otras leyes aplicables en general al gobierno”. Id., pág. 416. En otras palabras, el poder del Tribunal Supremo de adoptar reglas administrativas se debe ejercer en armonía con las leyes de control de gastos y de personal que aplican al gobierno en general.(2)
*608 No obstante, adviértase que esa misma disposición constitucional asigna expresamente tanto al Juez Presi-dente o Jueza Presidenta como al Director Administrativo o Directora Administrativa de los Tribunales la tarea particular de administrar la Rama Judicial. En específico, la segunda oración de la See. 7 del Art. V de la Constitución del Estado Libre Asociado dispone que “[e]l Juez Presi-dente dirigirá la administración de los tribunales y nom-brará un director administrativo, quien desempeñará su cargo a discreción de dicho magistrado”. Art. V, Sec. 7, Const. E.L.A., supra, pág. 416. Así, pues, la administración de la Rama Judicial recae por mandato constitucional en la persona del Juez Presidente o de la Jueza Presidenta del Tribunal Supremo de Puerto Rico.
Este Tribunal ha expresado que “los poderes constitu-cionales de naturaleza administrativa del Juez Presidente del Tribunal Supremo, de ordinario, deben ser interpreta-dos ampliamente”. (Cita omitida.) Bldg. Fast Cl. Servs. v. Asoc. C.B. Tower, 147 D.P.R. 874, 880 (1999). Véase, además, J. Trías Monge, El Sistema Judicial de Puerto Rico, San Juan, Ed. Universitaria, 1978, pág. 221 (“[fias obliga-ciones y facultades del Juez Presidente se conciben hoy con gran amplitud”).
Visto lo anterior, es trascendental analizar el surgi-miento histórico de esos amplios poderes. Al momento de aprobarse nuestra Constitución, el Procurador General ejercía la facultad de administrar los tribunales en Puerto Rico. Véanse: 4 Diario de Sesiones de la Convención Cons-tituyente 2613 (edición conmemorativa 2003); González v. Tribunal Superior, 75 D.P.R. 585, 609 (1953). Esa facultad pasó a manos del Juez Presidente tras nuestro proceso constituyente, culminado en 1952, en aras de garantizar un balance de poderes entre las ramas de gobierno. De esa forma, ese balance de poderes incluyó un contrapeso fundamental adicional al dividir funciones entre el Pleno del Tribunal y el Juez Presidente.
*609 El historial de la Convención Constituyente y múltiples fuentes históricas demuestran, sin espacio a dudas, que la administración del sistema judicial que adoptó nuestra Constitución se fundamenta en un sistema ejecutivo fuerte y centralizado, no colegiado, de autoridad administrativa bajo la dirección única del Juez Presidente o Jueza Presi-denta y del Director Administrativo o Directora Adminis-trativa que éste o ésta designa a su discreción. Véase Trías Monge, op. cit., pág. 221.(3)
Más aun, al adoptar una administración centralizada bajo la discreción única del Juez Presidente o de la Jueza Presidenta, la Convención Constituyente rechazó una reco-mendación de la Escuela de Administración Pública de la Universidad de Puerto Rico para que la administración de los tribunales se confiase a un cuerpo colegiado, denomi-nado Consejo Judicial, que hubiese tenido, además de au-toridad de aprobar reglas, la facultad para ejercer una su-pervisión administrativa general. Escuela de Administración Pública de la Universidad de Puerto Rico, La nueva Constitución de Puerto Rico, ed. facsimilar, Río Piedras, Ed. U.P.R., 2005, págs. 472-478; J. Trías Monge, Historia Constitucional de Puerto Rico, Río Piedras, Ed. U.P.R., 1982, Vol. III, pág. 98.
Los propósitos de la Convención Constituyente en cuanto a este aspecto de centralización administrativa son incuestionables. Ante una enmienda propuesta para elimi-nar la discreción del Juez Presidente para seleccionar al Director Administrativo de los Tribunales, el delegado Sr. Ernesto Ramos Antonini, presidente de la Comisión de la Rama Judicial en la Convención Constituyente, señaló lo siguiente:
*610 La mejor manera de pensar para resolver sobre esta en-mienda es entender cuál es el propósito de este artículo. El propósito de este artículo es el de que la responsabilidad de la administración de los tribunales de justicia recaiga en el presidente del Tribunal Supremo, y la letra del artículo al disponer “el Juez Presidente dirigirá la administración de los tribunales y nombrará un director”. De manera que a quien hay que proteger aquí es, en primer término, al po-der judicial [frente al Ejecutivo] en el sentido de garanti-zarle eficiencia en su funcionamiento por su adminis-tración. En segundo término, a quien hay que proteger aquí es al Juez Presidente del Tribunal Supremo [frente al Pleno del Tribunal] en el desempeño de su responsabilidad y des-cargue de su autoridad para que pueda cumplir con la en-comienda de la constitución que le dice que él dirigirá la administración. El administrador no es nada más que una herramienta que la constitución pone en sus manos para él manejarla según sus manos, su experiencia, su criterio le manden en su conciencia como juez presidente para se-guirla usando o no seguirla usando. (Enfasis suplido.) Dia-rio de Sesiones de la Convención Constituyente, supra, T. 3, pág. 1667.(4)
*611 La Convención Constituyente se nutrió de una extensa discusión que terminó en la delegación expresa de poder al Juez Presidente. Además, esa discusión incluyó un debate entre los delegados señor Ramos Antonini y Sr. Augusto Valentín Vizcarrondo. Este último proponía que el Director Administrativo sirviera conforme a un “reglamento”, mien-tras que el señor Ramos Antonini proponía que fuera a “discreción” del Juez Presidente. La postura favorecida fue la de Ramos Antonini. Véase Diario de Sesiones, supra, págs. 1668-1669.
Por otra parte, tampoco cabe duda de que el marco de acción administrativa según el cual operan el Juez Presi-dente o la Jueza Presidenta y el Director Administrativo o la Directora Administrativa es claramente independiente y no está subordinado a la función cuasilegislativa que os-tenta el Pleno del Tribunal Supremo para adoptar reglas sobre la administración.
Nuestra estructura de administración judicial sigue como modelo la recomendación de la American Bar Association y el ejemplo del Poder Judicial del estado de Nueva Jersey, en donde el Juez Presidente es la única figura eje-cutiva y centralizada, encargada de la administración de la Judicatura de manera independiente al Pleno del Tribunal. Véanse: N.J. Const., Art. VI, Sec. II, VII; E.H. Stern, Frustrations of an Intermediate Appellate Judge, 60 Rutgers L. Rev. 971, 976 (2008).
La propuesta promulgada por la American Bar Association fue acogida en Nueva Jersey, jurisdicción que, al mo-mento de conducirse los trabajos en la Convención Consti-tuyente de Puerto Rico, representaba el mejor ejemplo de un sistema unificado centralizado bajo la amplia dirección administrativa de un Juez Presidente. Véase A. Vanderbilt, Minimum Standards, pág. 63 (“ ‘New Jersey’ presents the best picture of a unified court system with rather complete powers of management entrusted to the chief justice ...”). Fue, precisamente, “[h]acia Nueva Jersey [donde] miramos al momento de ordenar nuestro presente *612 sistema de administración de justicia”. Ramírez de Arellano v. Srio. de Hacienda, 85 D.P.R. 823, 828 (1962). El Juez Presidente Trías Monge lo explicó, como parte de su análisis sobre la See. 7 del Art. V, Const. E.L.A., supra, de la forma siguiente:
Para esta época, tan sólo dos constituciones estaduales, la de Maryland y la de Nueva Jersey encargaban al Juez Presi-dente de la dirección de los tribunales. La de Nueva Jersey, la cual también proveía para el nombramiento por el Juez Presi-dente de un director administrativo, constituyó el precedente directo para la nuestra.
La Constitución de Nueva Jersey también fue el modelo uti-lizado en la redacción de la primera oración de la sección. La segunda oración se insertó en parte para fines de clarificación y en parte por razones análogas a las que provocaron las limi-taciones que se impusieron en la sección anterior al poder judicial de aprobar reglas de procedimiento; la indisposición de un número de delegados a dotar al Tribunal Supremo de de-masiado poder irrestricto.
Respecto al alcance de la frase “administración de tribuna-les”, tal como se emplea en esta sección, el informe de la Co-misión de la Rama Judicial sobre este particular es de especial interés, haciéndose en él una lista de las más importantes. El amplio significado que se le dio a esta frase complementó en modo esencial la unificación establecida en virtud de la sec-ción 2. Fue parte esencial de la intención legislativa evitar a todo trance huella alguna de administración colegiada. (Énfa-sis suplido y escolios omitidos.) Trías Monge, Historia Constitucional de Puerto Rico, op. cit., pág. 98. Véase, además, J. Trías Monge, La estructura del poder judicial en la Constitución de Puerto Rico, 46 Rev. Jur. U.P.R. 611, 630-631 (1977).
Como vemos, ese modelo que adoptamos de Nueva Jersey centralizó la responsabilidad de la operación de la Rama Judicial en la figura del Juez Presidente o de la Jueza Presidenta. Véase, además, Chief Justice Robert N. Wilentz, Separation of Powers - Judicial Independence in the 1980s, 49 Rutgers L.Rev. 835, 841 (1997). Para ello, la Constitución de Nueva Jersey, al igual que la de Puerto Rico, otorgó al Juez Presidente una facultad ejecutiva plena sobre la administración de los tribunales, distinta e independiente de la función cuasilegislativa de adoptar re- *613 glas (“rulemaking”) para la administración que se fijaría en el Tribunal Supremo. Véanse: N.J. Const., Art. VI, Sec. II, Par. 3; N.J. Const., Art. VI, Sec. VII, Par. 1; R.D. Lips-cher, A Tribute to Chief Justice Wilentz, 49 Rutgers L. Rev. 683, 683 (1997) (“With the Constitution of 1947, New Jersey ... enabl[ed] rulemaking authority in the Supreme Court and centralized] executive powers in the Chief Justice as administrative head of the courts ...”).
A la luz de lo anterior, se ha establecido que por dispo-sición constitucional, y de forma independiente al Pleno del Tribunal, el Juez Presidente de Nueva Jersey es el en-cargado de la administración de la Judicatura. Véase Stern, supra, pág. 976. Véanse, además: Kugler v. Helfant, 421 U.S. 117, 128 (1975) (“it is not the New Jersey Supreme Court, or its members, but the Chief Justice, who is the ‘administrative head’ of the New Jersey court system”); State v. Linares, 470 A.2d 39, 42 (N.J Super. Law Div. 1983) (“The Supreme Court has the power to promulgate rules of administration ... and independently, the Chief Justice, as administrative head of the court system, can promulgate binding directives ...”).
El marco de autoridad administrativa independiente bajo el cual se concibe la figura del Juez Presidente o Jueza Presidenta llevó a la Convención Constituyente de Nueva Jersey a rechazar una propuesta que pretendía sujetar su poder a la facultad del Tribunal Supremo de adoptar reglas. Véanse: 2 N.J. Constitutional Convention 1169; 4 N.J. Constitutional Convention 730; V. Dunn, Arthur T Vanderbilt’s Impact on Judicial Reform at the New Jersey Constitutional Convention of 1947, 29 Rutgers L.J. 731, 754 (1998).
El esquema finalmente adoptado en Nueva Jersey in-corpora los elementos de lo que se ha denominado un sis-tema ejecutivo fuerte, no colegiado, de autoridad adminis-trativa judicial. A tales efectos, se ha dicho:
Three basic models of administrative leadership have emerged: (1) the strong-executive model; (2) the traditional-colle *614 gial model; and (3) the modified-executive model. The model adopted depends largely on the legal and political authority vested in the state’s Supreme Court.
The strong-executive model features a chief justice whose functions essentially as the chief executive officer of the courts. Associate justices, aside from their essential voice in the rule-making process, act as mere advisors or consultants with regard to administrative matters. The chief justice acts and speaks for the entire judiciary. Few courts have adopted this model. Hawaii and New Jersey come perhaps the closest. (En-fasis suplido.) Waller y Goza, The Office of Chief Justice of the Supreme Court of Mississippi, 29 Miss. C.L. Rev. 469, 476 (2010).
Según este modelo, se ha observado que la facultad de fijar el criterio ejecutivo de la Rama Judicial recae en la figura del Juez Presidente o Jueza Presidenta. Véase R.W. Tobin, Creating the Judicial Branch: The Unfinished Reform 105 (National Center for State Courts, 1999) (“Supreme Court colleagues have little to do with administration, other than rulemaking. Normally, they fill only consultative roles, or the chief justice advises them of major changes before they become effective” (énfasis suplido)).
Además, cabe destacar que, al igual que en Puerto Rico, en treinta y cinco estados de Estados Unidos el Juez Pre-sidente del tribunal de última instancia es el encargado de administrar la Rama Judicial. Véase Bureau of Justice Statistics, State Courts Organization: Governance of the Judicial Branch, pág. 63 (2004). De esos treinta y cinco estados, veintinueve reconocen esa facultad al Juez Presi-dente por mandato constitucional. Id.
Al respecto, Trías Monge cita el criterio de la American Bar Association:
While general policy may appropriately be formulated by a group, responsibility for executing policy must be vested in an individual. Logically, the chief justice of the State’s highest court should have that responsibility and authority, and in states having an integrated judicial system this is the common pattern. Trias Monge, El sistema judicial de Puerto *615 Rico, op. cit., pág. 222, citando a A.B.A. Section on Judicial Administration, The Improvement of the Administration of Justice, 5ta ed., 1971, pág. 14.
En cuanto a este extremo, el Comité para el Estudio y la Evaluación del Sistema Judicial (Comité de 1965) sostuvo —en su informe al Tribunal Supremo— que “la dirección ejecutiva de la Rama Judicial ... puede ser objeto de ase-soramiento por parte de los jueces asociados o del Tribunal en pleno pero no compartirse en forma colegiada”. Comité para el Estudio y la Evaluación del Sistema Judicial, In-forme al Tribunal Supremo de Puerto Rico sobre la Oficina de Administración de los Tribunales, 1965, pág. 6. Resal-taba el informe del Comité de 1965, bajo la dirección de Trías Monge, que la Constitución y las propias condiciones inherentes de la dirección administrativa “requieren que la responsabilidad resida en el Juez Presidente como último centro de autoridad”. Id.
En este sentido, el señor Ramos Antonini advertía sobre la necesidad de reconocerle al Juez Presidente la autoridad que corresponde a la responsabilidad que se le fijó. Véase Diario de Sesiones de la Convención Constituyente, supra, T. 1, págs. 615-618. Lo mismo hemos sostenido en este Foro al expresar que el “Juez Presidente [se concibe, así,] como [la] figura principal constitucional en el área de lo administrativo del Poder Judicial ...”. Pueblo v. Tursi, 104 D.P.R. 12, 14 (1975).
“La amplia facultad otorgada al Juez Presidente” en materia de administración de la Rama Judicial—Negrón Soto v. Gobernador, 110 D.P.R. 664, 667 (1981)— se ilustra en el amplio significado que en la Convención Constitu-yente se le dio al término “administración”, al designar a dicho funcionario “como la persona encargada de la admi-nistración de los tribunales ...”. Diario de Sesiones, supra, T. 4, pág. 2613. Véase, además, Trías Monge, El sistema judicial de Puerto Rico, op. cit., pág. 125. En torno a este asunto, el Informe de la Comisión de la Rama Judicial bus-caba transferir a la Rama Judicial unas tareas que antes *616 estaban asignadas al Ejecutivo. Para ello, el Informe de la Comisión de la Rama Judicial a la Convención Constitu-yente en 1952, hizo constar que el término “administra-ción” usado en esta sección comprende, sin que se entien-dan excluidas otras similares y análogas, las funciones siguientes:
(1) Compilar estadísticas y preparar informes.
(2) Alquilar locales, comprar y proveer equipo y servicios.
(3) Conceder licencias y vacaciones a funcionarios y empleados.
(4) Investigar quejas y formular cargos, ante la autoridad correspondiente, contra funcionarios y empleados.
(5) Autorizar desembolsos dispuestos por ley y revisar [supervisar] las cuentas de todos los tribunales.
(6) Asignar y trasladar jueces.
(7) Aprobar reglamentos para las distintas cortes.
(8) Superentender [supervisar] en los tribunales. Diario de Sesiones, supra, T. 4, ed. 1961, pág. 2613. Véase, en igual sentido, Notes and Comments on the Constitution of the Commonwealth of Puerto Rico, Washington, D.C., 1952, págs. 92— 93.
A la luz lo anterior, y en atención al texto y al historial de la Sec. 7 del Art. V de la Constitución, es evidente que la aprobación de las Reglas para los Procedimientos de Inves-tigaciones Especiales Independientes de la Rama Judicial, en la medida que en sus Reglas 7 y 8 autorizan al Pleno del Tribunal Supremo a rescindir o resolver contratos válida-mente otorgados por la Administración de los Tribunales en el descargo de sus funciones administrativas, constitu-yen una actuación contraria a la Constitución. Veamos.
III
En primer lugar, dichas prerrogativas —utilizadas en la segunda Resolución para rescindir el contrato del licen-ciado López Cintrón— claramente exceden las facultades constitucionales del Pleno del Tribunal Supremo al invadir zonas que han sido constitucionalmente reservadas al Juez *617 Presidente o Jueza Presidenta como máximo o máxima dirigente de la Rama Judicial. Después de todo, el acto de otorgar v rescindir contratos es una función inherentemente administrativa en el ámbito subernamental. De hecho, al definir el término “administración” en la referida disposi-ción constitucional, el Informe de la Comisión de la Rama Judicial de la Convención Constituyente incluyó la autori-zación de desembolsos dispuestos por ley. Diario de Sesio-nes, supra, T. 4, pág. 2613. Si bien es cierto que tal facultad está sujeta a las reglas de administración que adopte tanto el Tribunal Supremo como la Asamblea Legislativa, ello no debe ni puede tener el alcance de facultar a esos cuerpos a ejecutar o a atribuirse directamente dichas funciones ad-ministrativas en directa contravención al mandato consti-tucional y a la independencia judicial en su vertiente administrativa. De lo contrario, la aprobación de regla-mentos generales con disposiciones específicas de aplica-ción retroactiva, contrarias a una actuación administrativa válida ya realizada, abriría la puerta al control ex post facto de todas las determinaciones ejecutivas del Juez Pre-sidente o de la Jueza Presidenta. Ello, a su vez, eliminaría por completo de nuestra Constitución las prerrogativas y facultades expresamente delegadas al Juez Presidente o Jueza Presidenta.
Las Resoluciones del Tribunal se tratan, pues, de una arrogación ilegítima de un poder que el Pueblo le concedió expresamente al Juez Presidente o Jueza Presidenta y al Director Administrativo o Directora Administrativa de los Tribunales al ratificar la Constitución del Estado Libre Asociado de Puerto Rico. Dicho proceder, en esencia, cons-tituye una enmienda a la Constitución sin el consenti-miento del Pueblo mediante el mecanismo dispuesto en la Sec. 1 del Art. VII de la Constitución del Estado Libre Aso-ciado de Puerto Rico, Const. E.L.A., supra.
Para enmendar la delegación expresa de poderes a la figura del Juez Presidente o de la Jueza Presidenta, así como el voluminoso historial que demuestra la intención *618 específica de nuestros constituyentes, no basta con la in-terpretación errónea del texto constitucional que se recoge en las Resoluciones de epígrafe. Para ello se requiere una resolución concurrente de la Asamblea Legislativa, apro-bada por más de dos terceras partes de los miembros de cada cámara, y obtener el favor de la mayoría de los elec-tores en un referéndum, a celebrarse con no menos de tres meses de antelación. Art. VII, Sec. 1, Const. E.L.A., supra. Dicha resolución, según ha expresado este Tribunal, tiene que surgir a iniciativa de la propia Asamblea Legislativa. Córdova y otros v. Cámara Representantes, 171 D.P.R. 789, 803 (2007); Ortiz Angleró v. Barreto Pérez, 110 D.P.R. 84 (1980), opinión concurrente del Juez Asociado Señor Ne-grón García.
Obviar ese riguroso trámite constitucional abona aún más al clima de incertidumbre en que se dan las Resolu-ciones en controversia y quebranta la seguridad jurídica del país. Con ese proceder, no solo se pone en entredicho el poder de este Tribunal para ejercer su jurisdicción, sino que se transgrede el clima democrático en que debe cana-lizarse la separación constitucional de poderes guber-namentales. En fin, con el presente trámite se atenta contra los poderes del electorado y de la Asamblea Legislativa mientras se pasa por alto que los puertorriqueños se reser-varon para sí el poder de avalar y rechazar cambios en su Constitución. Berríos Martínez v. Gobernador II, 137 D.P.R. 195 (1994).
De otra parte, se ha expresado que en situaciones como la nuestra, en que existe un proceso riguroso para enmen-dar el texto constitucional —contrario a constituciones donde se facilita el trámite de enmiendas— las mayorías tienen menos oportunidad de menoscabar los derechos de las minorías mediante fluctuaciones continuas del texto, sujetas al criterio popular. Véase J.J. Alvarez González, Otra mirada a la “Constitución discrecional”, en R. Saba (ed.), Estado de derecho y democracia: Un debate acerca del “rule of law” 183, 198-200 (2001), publicado en inglés bajo *619 el título Another Look at the “Discretionary Constitution”, 71 (Núm. 1) Rev. Jur. U.P.R. 1, 21-25 (2002). Ese principio de protección a las minorías depende precisamente de que este Foro actúe de conformidad con los requisitos constitu-cionales para encausar esas enmiendas. Si bien es cierto que un proceso riguroso de enmienda constitucional puede interpretarse como una mayor amplitud al ámbito de la revisión judicial, ello no debe interpretarse como una carta blanca para enmendar la Constitución desde el estrado.
Así pues, de cara al futuro, corresponde al Pueblo de Puerto Rico retomar democráticamente los poderes que quiso delimitar expresamente en su Constitución y re-orientarlos de forma que respondan al esquema constitu-cional que avaló hace sesenta años. Como ha expuesto el profesor Alvarez González, refiriéndose a situaciones en que el Pueblo soberano revoca determinaciones judiciales mediante enmiendas constitucionales,
[l]a utilización del proceso constitucional de enmienda en esas circunstancias no sólo tiene el efecto de arrasar una decisión judicial en particular. Tiene el más importante efecto de recor-dar a los intérpretes finales de la constitución que sus interpre-taciones en efecto son revisables, lo que puede conducirles a ejercer mayor cautela en futuras interpretaciones. (Enfasis suplido.) Id.
> I — I
Por otro lado, la acción de ordenar que se deje sin efecto un contrato válido retroactivamente en virtud de un Regla-mento aprobado para tales propósitos específicos, presenta una controversia muy seria que, de acatarse, violentaría doctrinas firmemente arraigadas sobre el menoscabo de obligaciones contractuales bajo la Constitución de Estados Unidos y la Constitución del Estado Libre Asociado de Puerto Rico. Véase United States Trust Co. v. New Jersey, 431 U.S. 1 (1977).
Mediante su actuación, cinco Jueces y una Jueza se atri-buyen una facultad administrativa que no les corresponde, *620 que no está cobijada por la inmunidad judicial sobre adju-dicaciones y que tampoco satisface el escrutinio aplicable al menoscabo de obligaciones contractuales públicas.(5)
La orden para que se dejara sin efecto el contrato entre la Oficina de Administración de Tribunales y el licenciado López Cintrón, viola la doctrina contra el menoscabo de las obligaciones contractuales al amparo del Art. I, Sec. 10, Cl. 1 de la Constitución de Estados Unidos y el Art. II, Sec. 7 de la Constitución del Estado Libre Asociado de Puerto Rico, supra. Un mero análisis superficial del estándar apli-cable al menoscabo de las obligaciones contractuales públi-cas demuestra que la actuación de esos cinco Jueces y una Jueza es inconstitucional.
En específico, al analizar una obligación pública, como en esta ocasión, es necesario determinar si el menoscabo responde a un interés gubernamental importante. Bayrón Toro v. Serra, 119 D.P.R. 605, 620 (1987); Warner Lambert Co. v. Tribunal Superior, 101 D.P.R. 378, 395 (1973). Si es así, corresponde establecer un balance razonable entre el interés social en proteger el bien común y el interés social en proteger las relaciones contractuales contra la aplica-ción arbitraria e irrazonable de las leyes. Id. A esos efectos, se debe determinar si el menoscabo es necesario para al-canzar ese interés gubernamental. Bayrón Toro v. Serra, supra, pág. 620; United States Trust Co. v. New Jersey, supra. El estándar para evaluar el menoscabo por el Es-tado de sus propias obligaciones es más exigente que el aplicable a las obligaciones privadas. Id.
El propósito de esta doctrina es fomentar y proteger la certeza en las consecuencias legales de lo pactado válida-mente y la estabilidad en las relaciones contractuales. Warner Lambert Co. v. Tribunal Superior, supra. No obs- *621 tante, este Tribunal ha decidido, irrazonablemente, menos-cabar una obligación contractual pública sin debido pro-ceso alguno. Ello, sin demostrar algún interés que supere la protección de la certeza de las obligaciones contractuales y la transparencia de la Rama Judicial promovida por la contratación válida(6) —desde el punto de vista de poder administrativo— del licenciado López Cintrón.
V
En vista de que el acto cuasilegislativo de reglamentar las investigaciones de la Rama Judicial, según aplicado re-troactivamente, infringe importantes disposiciones consti-tucionales sobre delegación de poderes al Juez Presidente o a la Jueza Presidenta y las protecciones económicas contra el menoscabo de obligaciones contractuales, debemos cues-tionar ¿bajo qué fuente de derecho podía decretarse que se deje sin efecto el contrato de la Oficina de Administración de los Tribunales? Examinemos, pues, las doctrinas jurídi-cas para la extinción de los contratos por la vía judicial.
En ese sentido, lo primero que debe quedar claro es que se ha ordenado dejar sin efecto un contrato válido. Nuestro ordenamiento provee unos parámetros claros y específicos sobre la contratación gubernamental. Para que un con-trato gubernamental sea válido, se tiene que cumplir con *622 una serie de requisitos formales adicionales a los dispues-tos para los contratos privados.(7)
Una vez se cumplen los requisitos formales de contrata-ción, los contratos son válidos y exigióles. Johnson & Johnson v. Mun. de San Juan, 172 D.P.R. 840, 853 (2007); Fernández & Gutiérrez v. Mun. San Juan, supra, pág. 833. Asimismo, hemos expresado que “[c]uando el Estado con-trata, la interpretación del contrato debe hacerse como si se tratara de una contratación entre dos personas particulares”. De Jesús González v. A.C., 148 D.P.R. 255, 267 (1999). Ello significa que cuando el Estado otorga un contrato con una persona privada, ambos están obligados por las normas generales relativas a los contratos. Id.
Ante este Tribunal no se ha cuestionado el incumpli-miento con alguno de esos requisitos. Por ello, no cabe la posibilidad de dejar sin efecto el contrato en controversia por razón de las disposiciones adicionales que regulan la contratación gubernamental.
Más aún, esta actuación surge motu proprio, sin estar presentes ante el Tribunal los requisitos de justiciabilidad para ejercer su jurisdicción. Véase E.L.A. v. Aguayo, 80 D.P.R. 552 (1958). Ello es un requisito esencial para dejar sin efecto un contrato por la vía judicial.
En la presente situación, una mayoría de este Tribunal ordenó dejar sin efecto un contrato pactado válidamente. La orden de este Tribunal mediante las Resoluciones en cuestión no puede aquilatarse ni como una rescisión, reso-lución, anulación o extinción de la obligación pactada, ni como una garantía de los requisitos establecidos para la *623 contratación gubernamental. Tampoco aplican las formas de extinguir una obligación ni se dan los requisitos de jus-ticiabilidad, por lo que no puede decirse que el Tribunal ha actuado en el ejercicio de su jurisdicción. La determinación de este Tribunal se trata, pues, de una actuación evidente-mente inválida.
VI
En su segunda Resolución, los Jueces y la Jueza de la mayoría anunciaron la manera como asegurarían el cum-plimiento de una directriz inconstitucional: el desacato. Sin embargo, un análisis exhaustivo de las disposiciones que conceden el poder de imponer el desacato en nuestro ordenamiento revela que no existe una fuente jurídica para ese remedio judicial en las presentes circunstancias.
El desacato es un procedimiento sui generis y las fuen-tes del poder para imponerlo son varias. Véanse: Pueblo v. Vega, Jiménez, 121 D.P.R. 282, 290 (1988); Pueblo v. Lamberty González, 112 D.P.R. 79, 81 (1982). Entre estas, figu-ran la Regla 40.10 de Procedimiento Civil, 32 L.P.R.A. Ap. V, el Art. 284 del Código Penal de Puerto Rico, 33 L.P.R.A. sec. 4912, la Ley de Desacato, Ley de 1 de marzo de 1902, según enmendada, 33 L.P.R.A. secs. 517-518, que tipifican el desacato criminal, la Regla 242 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, y Art. 284 de la Ley 149-2004 (33 L.P.R.A. sec. 4912), que establece los distintos procedi-mientos a seguir ante el desacato criminal directo y el indirecto. Además, los tribunales tienen el poder inherente para castigar por desacato. Pérez Pascual v. Vega Rodríguez, 124 D.P.R. 529, 535 (1989); Pueblo v. García Rivera, 103 D.P.R. 547, 551 (1975).
La diferencia entre el desacato civil y el desacato criminal recae en la naturaleza y el propósito de cada uno. Pueblo v. Vega, Jiménez, supra. El desacato civil tiene un pro-pósito reparador: inducir a alguien a cumplir con una *624 obligación. íd., citando a Shillitani v. United States, 384 U.S. 364 (1966). Por otro lado, el desacato criminal tiene como objetivo vindicar la autoridad del tribunal. Id., citando a States v. Mine Workers, 330 U.S. 258 (1947); In re Cruz Aponte, 159 D.P.R. 170, 182 (2003).
Por otra parte, este Tribunal ha señalado que, para que una conducta sea constitutiva de desacato criminal, esta debe menoscabar el respeto debido al tribunal e interrum-pir los procedimientos llevados a cabo en el foro judicial. In re Velázquez Hernández, 162 D.P.R. 316, 327 (2004). Al res-pecto, establecimos que quien desobedezca cualquier de-creto, mandamiento, citación u otra orden legal expedida por el tribunal será sancionado con una pena de reclusión o multa, a discreción del tribunal. (8) Pérez Pascual v. Vega Rodríguez, supra, pág. 534; Pueblo v. Escalera, 95 D.P.R. 148 (1967). De esta forma, hemos reiterado la existencia del poder inherente de los tribunales para hacer efectiva su jurisdicción y sus pronunciamientos y vindicar sus directrices. In re Velázquez Hernández, supra; Pérez Pascual v. Vega Rodríguez, supra, pág. 535; Sterzinger v. Ramírez, 116 D.P.R. 762 (1985).
Este poder inherente no se extiende a las agencias ad-ministrativas, las cuales carecen del poder coercitivo que ostentan los tribunales para exigir el cumplimiento de sus órdenes y resoluciones. Véanse: D.A.Co. v. Alturas Fl. Dev. Corp. y otro, 132 D.P.R. 905, 923 (1993); Srio. D.A.C.O. v. Comunidad San José, Inc., 130 D.P.R. 782, 795 (1992).
*625 Por otra parte, la Regia 242 de Procedimiento Criminal, supra, establece el procedimiento a seguir en casos donde ha habido una conducta que pudiese dar lugar a la impo-sición de un desacato criminal. Dicha regla dispone:
(a) Procedimiento sumario. El desacato criminal podrá cas-tigarse en forma sumaria siempre que el juez certifique que vio u oyó la conducta constitutiva de desacato, y que se come-tió en presencia del tribunal. La orden condenando por des-acato expondrá los hechos y será firmada por el juez, deján-dose constancia de ella en las minutas del tribunal.
(b) Procedimiento ordinario. Salvo lo provisto en el inciso (a) de esta regla, en todo caso de desacato criminal se le dará al acusado previo aviso la oportunidad de ser oído. El aviso ex-pondrá el sitio, hora y fecha de la vista, concederá al acusado un tiempo razonable para preparar su defensa, hará saber al acusado que se le imputa un desacato criminal y expondrá los hechos esenciales constitutivos del mismo. El acusado tendrá derecho a su libertad provisional bajo fianza de acuerdo con las disposiciones de estas reglas. Si el desacato se fundara en actos o conducta irrespetuosa hacia un juez, éste no podrá conocer de la causa excepto con el consentimiento del acusado. 34 L.P.R.A. Ap. II, R. 242.
Los múltiples requisitos procesales que requiere el pro-cedimiento sumario se deben a que constituye una excep-ción a las garantías constitucionales, ya que en este se an-tepone el interés de mantener el orden y la integridad durante el proceso judicial. In re Velázquez Hernández, supra, pág. 331; Pueblo v. Susoni, 81 D.P.R. 124, 156 (1959). En particular, la garantía constitucional a no ser privado de la libertad o propiedad sin un debido proceso de ley, hace mandatoria la observancia de todas las salvaguardas constitucionales aplicables a toda clase de imputación tipi-ficada y castigada como un delito criminal. E.L.A. v. Asoc. de Auditores, 147 D.P.R. 669, 687 (1999). La consecuencia de incumplir con estos requisitos en el procedimiento de desacato sumario es que la sentencia quedará enteramente nula y sin efecto. Id.; Pueblo v. Tribunal Superior, 92 D.P.R. 471, 476 (1965).
*626 Asimismo, ante los hechos específicos de las Resoluciones en controversia, cabe destacar que, si un tribunal no tiene jurisdicción para dictar una orden, esta es nula y no tiene efecto alguno, y la parte que se niegue a obedecerla no incu-rre en desacato ni puede ser castigada por ello. Coll v. Leake, Juez de Distrito, 17 D.P.R. 857 (1911); Núñez v. Soto Nussa, Juez de Distrito, 14 D.P.R. 199 (1908). Para que exista el desacato no solamente la corte debe tener jurisdicción sobre la persona del peticionario, sino también sobre el asunto en cuestión, así como para dictar la sentencia determinada cuyo incumplimiento produciría el desacato. Id.
Por otra parte, el Art. 34-A del Código Político de 1902, según enmendado, 2 L.P.R.A. sec. 154a, confiere al poder legislativo la facultad de solicitar la ayuda del foro judicial para hacer cumplir sus órdenes relacionadas con la compa-recencia y el examen de testigos durante una investi-gación. La facultad de castigar mediante desacato reside únicamente en el foro judicial, en el ejercicio de sus funcio-nes judiciales adjudicativas; no legislativas.
Tampoco debemos perder de vista que los jueces y las juezas deben utilizar correctamente su autoridad para im-poner el desacato como castigo. In re Cruz Aponte, supra, pág. 181. Hemos fundamentado lo anterior en el Canon XVII de Ética Judicial, 4 L.P.R.A. Ap. IV-A, el cual esta-blece, entre otras cosas, que los jueces y las juezas dirigi-rán los trabajos del tribunal con orden y decoro, y estarán alertas “contra todo proceder que pueda afectar la dignidad y el respeto debidos al tribunal”. Así pues, expresamos que “los jueces deben utilizar el desacato como última alterna-tiva para vindicar la dignidad del tribunal, debido a que el uso indiscriminado de este instrumento equivaldría a una falta de temperamento judicial”. In re Cruz Aponte, supra, pág. 181.
Como surge de lo anterior, no cabe duda de que el des-acato es una herramienta coercitiva del foro judicial para poner en vigor una orden dictada como parte de un proceso adjudicativo. Esto es, un proceso considerado por un tribu *627 nal en su carácter de juzgador de controversias o para ase-gurar una comparecencia. Ninguna de esas disposiciones contempla una imposición unilateral como resultado de una regla legislativa de aplicación general.
Como vimos, ni tan siquiera las agencias que realizan funciones cuasilegislativas al amparo de sus poderes dele-gados para establecer reglas —análogas a las que ha des-cargado en esta situación este Tribunal al amparo de la See. 7 del Art. V de la Constitución del Estado Libre Aso-ciado de Puerto Rico, supra— están facultadas para impo-ner desacatos con el fin de hacer valer sus órdenes o sus reglamentos. Las agencias administrativas están obliga-das a acudir al foro judicial a solicitar auxilio mediante un proceso adversativo ordinario, cosa que no está presente ante este Foro. Véase RDT Const. Corp. v. Contralor I, 141 D.P.R. 424 (1996). No podemos permitir que una posible violación a una regla de esta Curia, actuando en su función cuasilegislativa o administrativa y no adjudicativa, tenga como sanción el encarcelamiento automático. Véase Wong Wing v. United States, 163 U.S. 228 (1896) (las agencias administrativas no pueden ordenar un encarcelamiento).
Dicha actuación socava sustancialmente el estado de de-recho y la seguridad jurídica de Puerto Rico. Además, pone en precario la libertad física de ciudadanos que, ante el actual precedente, podrían verse afectados por una orden de encarcelación emitida por el Tribunal Supremo en au-sencia de un caso o controversia.
VII
Por último, debemos llamar la atención a otra prohibi-ción constitucional —fundamentada en la protección de de-rechos individuales— que esta acción de una mayoría de este Tribunal podría violar. La Sec. 12 de la Carta de De-rechos de la Constitución del Estado Libre Asociado de Puerto Rico preceptúa que £‘[n]o se aprobarán leyes ‘ex post facto’ ni proyectos para condenar sin celebración de juicio”. *628 (Énfasis suplido.) Const. E.L.A., supra, pág. 364. Esta dis-posición es idéntica a la disposición en la Constitución federal. El Prof. José Julián Álvarez González ha expre-sado que
[e]l Art. II, [Sec.] 12, calcando al Art. I, [Sec.] 9, [Sec.] 3 de la Constitución federal, prohíbe los bills of attainder (“proyectos para condenar sin celebración de juicio”). Se trata de un dere-cho íntimamente relacionado con otras garantías constitucio-nales, tales como el debido proceso procesal, la prohibición de leyes ex post facto y la libertad de expresión. La única decisión que lo discute, muy brevemente, es Pueblo v. Figueroa Pérez, 96 DPR 6 (1968). Allí se planteó que la disposición de la Ley de la Bolita que ordenaba que los juicios se celebraran por tribunal de derecho, independientemente de la severidad de la pena que pudiere imponerse, 33 LPRA [see.] 1250, constituía un bill of attainder. Correctamente, pero con poca discusión, el Tribunal rechazó este planteamiento:
“El estatuto de proscripción es una forma que utilizaba el poder soberano para castigar a una persona designada por su nombre o a miembros determinables de un grupo de personas. United States v. Lovett, 328 US 303 (1946). Otra característica de tal estatuto es que niega el derecho a un juicio en que las personas afectadas puedan obtener una adjudicación de sus derechos. ...
[D]esignar una categoría de personas que poseen una carac-terística general normalmente no se considera contrario a esta disposición constitucional. L. Tribe, American Constitutional Law 643 (2a ed. 1988).” J.J. Alvarez González, Derecho constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos, Bogotá, Ed. Temis, 2009, pág. 683.
En la Convención Constituyente, el Informe de la Comi-sión de Carta de Derechos señaló que “los llamados bills of attainder [c]onstituyen un atentado al debido proceso de ley. La garantía que recomendamos tiene el propósito de evitar que las legislaturas actúen judicialmente”. (Énfasis suplido.) Diario de Sesiones, supra, T. 4, pág. 2572. De otra parte, se ha establecido que “un bill of attainder es un cas-tigo declarado legislativamente (a menudo con una deter-minación de culpabilidad respecto a algún crimen o activi-dad) para ciertos individuos en específico”. (Traducción nuestra.) J. Novak y R. Rotunda, Constitutional Law, 6ta *629 ed., Minnesota, 2000, Sec. 11.9(c), pág. 466 (“A bill of attainder is a legislatively declared punishment (often with a legislative finding of guilt regarding some crime or activity) for certain specific individuals”).
Lo más alarmante de las Resoluciones en controversia es que atentan contra la libertad física de una persona sin celebración de un juicio. Eso fue precisamente lo que quiso evitar la cláusula constitucional estadounidense:
Those who wrote our Constitution well knew the danger inherent in special legislative acts which take away the life, liberty, or property of particular named persons because the legislature thinks them guilty of conduct which deserves punishment. They intended to safeguard the people of this country from punishment without trial by duly constituted courts. United States v. Lovett, 328 U.S. 303, 317 (1946).
Por otra parte, es necesario que se garantice una serie de derechos procesales antes de dictar una orden judicial que afecte los intereses libertarios de un ciudadano. Para privar a una persona de su libertad se requiere un proceso adjudicativo en el cual, como mínimo, se garantice al ciu-dadano una notificación adecuada del proceso, un juzgador imparcial, la oportunidad de ser oído, el derecho a contra-interrogar y examinar la evidencia en su contra, la oportu-nidad de ser asistido por un abogado y que la decisión se base en el expediente. McConnell v. Palau, 161 D.P.R. 734, 758 (2004); Rivera Rodríguez & Co. v. Lee Stowell, etc., 133 D.P.R. 881, 889 (1993).
La orden de carácter cuasilegislativo que emitió el Tribunal determina, de manera retroactiva y sin la celebra-ción de un juicio, la pena que enfrenta una persona identi-ficada específicamente por su nombre y apellido, la Hon. Sonia I. Vélez Colón, por realizar los deberes de su cargo público. A la luz de los fundamentos de derecho antes es-bozados, este tipo de actuación es precisamente la que se quiso evitar mediante la prohibición constitucional que adoptamos íntegramente de Estados Unidos. Por ello, la actuación de una mayoría de este Tribunal, al ordenarle a *630 la Directora Administrativa a “dejar sin efecto”, “so pena de desacato”, viola importantes principios constitucionales que este Foro, en vez de malograrlos, debería garantizar.
VIII
Por todo lo anterior, me veo forzado a concluir que las Resoluciones que ha emitido este Tribunal son contrarias a la Constitución del Estado Libre Asociado de Puerto Rico y a las prohibiciones contra el menoscabo de obligaciones contractuales y las garantías de debido proceso de ley de la Constitución de Estados Unidos. Los poderes de adminis-tración de la Rama Judicial fueron específicamente delimi-tados por nuestra Convención Constituyente. Permitir que en el futuro, mediante el poder de reglamentación, una mayoría de este Tribunal anule retroactivamente acciones y decisiones administrativas válidamente adoptadas por el Juez Presidente o la Jueza Presidenta y puestas en vigor por el Director Administrativo o la Directora Administra-tiva de los Tribunales, conllevaría usurpar el control de la administración de la Rama Judicial a través del poder de reglamentación. Ese esquema fue rechazado por nuestros constituyentes, quienes eligieron el sistema de control centralizado. El historial es claro: lo que no se quiso fue precisamente un sistema de administración colegiado.
Peor aún, ante esta situación, la actuación de la mayo-ría atenta contra los derechos constitucionales individua-les de las personas involucradas, sin adelantar fin público o interés gubernamental alguno. Simplemente se quería intervenir con el curso administrativo de una Rama de Go-bierno para frenar una investigación sobre el uso de recur-sos públicos —ordenada válidamente por los funcionarios llamados y las funcionarlas llamadas a hacerlo— sin que se haya presentado un caso o una controversia sobre el contrato afectado y sin celebrar un debido proceso adjudi-cativo.
*631 IX
Antes de concluir, me corresponde dejar plasmadas unas preocupaciones sobre la aplicación futura de las Re-soluciones en controversia. En cuanto a la primera Resolu-ción, hay que destacar que estas Reglas se adoptaron en un solo acto con la segunda Resolución. Ello debe ser motivo de análisis al momento de evaluar su aplicación. ¿Son es-tas Reglas de aplicación general? ¿Acaso el hecho de que, desde su propia introducción, se hace referencia específica a las circunstancias en que se aprobaron y que existía una investigación en curso permiten inferir lo contrario? ¿Por qué la Resolución dispone que “resulta inapropiado que una funcionaría de confianza del Juez Presidente contrate servicios para realizar una investigación sobre el uso de fondos de la Rama Judicial relacionada con los serios seña-lamientos contra el Juez Presidente ...”? In re Aprobación Rs. Proc. Esp. RJ, 184 D.P.R. 500, 502 (2012). ¿No está el Tribunal prejuzgando la legalidad de un asunto que no se ha cuestionado ante foro judicial alguno ?
Además de prejuzgar la validez de la contratación antes mencionada, las premisas en que se basan ambas Resolu-ciones resultan altamente preocupantes, pues dan la im-presión de que este Tribunal ha adjudicado la validez de las investigaciones iniciadas por las otras ramas de go-bierno sin que ese asunto haya sido cuestionado ante foro judicial alguno. Ante ese cuestionable proceder, análogo a una opinión consultiva, es imperativo preguntarse si este Tribunal se ha autoexcluido de examinar controversias fu-turas sobre la legalidad de las investigaciones en curso. Véase E.L.A. v. Aguayo, supra. Máxime cuando esas inves-tigaciones podrían lacerar importantes derechos constitu-cionales individuales que, por imperativo del debido pro-ceso de ley, conllevan el derecho a una adjudicación ante un juzgador imparcial. Véase Alvarez González, op. cit., págs. 613-614.
*632 Por otro lado, la Regla 2 de la primera Resolución dis-pone que “[e]stas reglas ... [t]ienen el fin de garantizar la pureza de los procedimientos investigativos realizados con fondos de la Rama Judicial, incluyendo ... cualquier otro asunto de auditoría de recursos judiciales”. In re Aprobación Rs. Proc. Esp. RJ, supra, pág. 502. Asimismo, la Regla 3 preceptúa que “ [e] stas reglas regirán cualquier procedi-miento investigativo realizado con fondos de la Rama Judicial relacionado con el uso de su personal con la asigna-ción y fiscalización de fondos y de recursos judiciales”. Id., pág. 503. Encima, la Regla 8 establece que “[c]ualquier contrato otorgado que no cumpla con el procedimiento y los parámetros dispuestos por estas Reglas, quedará resuelto o rescindido, según sea el caso ...”. Id., pág. 505. ¿Significa eso que todos los contratos de auditoría de la Rama Judicial válidamente otorgados también quedan menoscabados de forma inconstitucional?
Por su parte, la Regla 6(d) establece los requisitos para cualificar como miembros de las comisiones de investiga-ción que designará el Tribunal al amparo de estas Reglas. Esos requisitos no incluyen el ser abogado. No obstante, la Regla 6(f) requiere a la Comisión que realice un informe que "deberá contener una exposición de los hechos que die-ron lugar a la investigación y un análisis de estos a la luz del derecho aplicable”. In re Aprobación Rs. Proc. Esp. RJ, supra, pág. 504. Cabe preguntarse, ¿descansará este Tribunal en un análisis de derecho realizado por personas que no tienen que ser profesionales del derecho?
Por otro lado, la Regla 6(f) también exige que los expe-dientes de las investigaciones sean de “carácter confidencial”. In re Aprobación Rs. Proc. Esp. RJ, supra, pág. 504. ¿Sabemos durante cuanto tiempo serán confiden-ciales? ¿No es este un lenguaje precisamente inconstitucio-nal a la luz de lo resuelto en Soto v. Srio. de Justicia, 112 D.P.R. 477, 503 (1982)? (“[N]inguna ley de confidencialidad absoluta pued[e] invocarse frente al derecho constitucional *633 de la ciudadanía de obtener información de su gobierno que pudiera revelar conducta cuestionable, susceptible de desagravio”). Véase, además, Ortiz v. Dir. Adm. de los Tribunales, 152 D.P.R. 161, 183 (2000) (“No se justifica que extendamos la confidencialidad de los expedientes investi-gativos en procedimientos disciplinarios judiciales una vez la fase investigativa ha culminado con una determinación final y firme”).
Finalmente, se hace poco menos que imposible delimitar el alcance de la investigación ordenada por la segunda Resolución. Por un lado, ambas Resoluciones enmarcan la aprobación de las Reglas y la designación de la Comisión en las circunstancias relacionadas con la contratación del licenciado López Cintrón. De hecho, la Regla 5 de la Pri-mera Resolución establece que, tras presentarse “una soli-citud para investigación, el Tribunal en Pleno decidirá si ordena y remite el asunto a la Comisión ...”. In re Aprobación Rs. Proc. Esp. RJ, supra, pág. 503. Es decir, que será necesario enmarcar un “asunto” objeto de investigación para así poderlo remitir a la Comisión. Sin embargo, al acudir al texto de la encomienda ordenada por la segunda Resolución, vemos que esta dispone que “[l]a Comisión de-berá investigar el uso de fondos y recursos públicos de la Rama Judicial, así como los desembolsos por parte de la OAT y su directora”. In re Miembros Com. Esp. Independiente, supra, pág. 508. Cómo interpretar el alcance tan vago y ambiguo de estos textos representará, sin duda, un enorme reto.
Ante estas preocupaciones sobre el texto de las referidas Resoluciones, resulta lógico pensar que este será el princi-pio de una larga controversia sobre la distribución de po-deres internos de la Rama Judicial y que podemos antici-par desestabilizará por muchos años la administración de una de las tres Ramas de nuestro ordenamiento constitu-cional. Lo peor es que el daño es autoinfligido.
*634 X
A modo de epílogo, deseo expresar que nos corresponde a todos defender nuestras instituciones y sostener el es-tado de derecho que es fundamental para nuestra convi-vencia como sociedad democrática. Todo país necesita po-der confiar en una seguridad jurídica garantizada, principalmente, por su Tribunal Supremo. Cuando un máximo Foro judicial dictamina, sin tan siquiera tener un caso ante sí, que puede arrebatar la libertad física de un ciudadano, se pone en entredicho el estado de derecho. Cuando un máximo Foro judicial deja sin efecto obligacio-nes contractuales válidas que no han sido puestas en con-troversia y que no se le han sometido para adjudicación, se socava la legitimad y confianza de un pueblo en su sistema judicial y la seguridad jurídica de todas las personas, in-cluyendo a las empresas comerciales e industriales.
Yo continuaré defendiendo con firmeza la Constitución a la que me he adherido con convicción durante casi tres décadas en este Foro. Confío que lo ocurrido nos obligue a todos los miembros de este Tribunal, incluyendo a este ser-vidor, a reflexionar sobre la sabiduría de este modo de resolver nuestras diferencias y que el tiempo nos permita restablecer el diálogo y la confianza que el país espera de todos los que tenemos el privilegio de servir al país en esta Curia. Invito a mis compañeros Jueces y compañeras Jue-zas a hacer lo mismo, conscientes de que la Constitución debe siempre prevalecer sobre nuestras preferencias personales. No olvidemos que debemos ser prudentes en el ejercicio de nuestros poderes por el bien de la justicia y de Puerto Rico.(9) En lo que a este servidor respecta, mi com- *635 promiso siempre ha sido y será con esta institución y con la Constitución que juré defender con fidelidad en dos ocasio-nes, una como Juez Asociado y otra como Juez Presidente.

 Véase In re Solicitud Aumentar Núm. Jueces TS, 180 D.P.R. 54 (2010).

 La Ley de la Judicatura del Estado Libre Asociado de Puerto Rico de 2003, Ley Núm. 201-2003, según enmendada (Ley de la Judicatura de 2003), aclara el alcance del poder reglamentario del Tribunal. A tales efectos, el Art. 2.002 dispone:
“El Tribunal Supremo adoptará para el Tribunal General de Justicia Reglas de Evidencia y de Procedimiento Civil y Criminal, así como Reglas para la Administra-ción de los Tribunales, de conformidad con lo provisto por la Constitución del Estado Libre Asociado de Puerto Rico. En la adopción de dichas Reglas se tomarán en cuenta los principios y objetivos de [esta ley]. Las Reglas de Administración estarán sujetas a las leyes relativas a suministros, personal, fiscalización y asignación de fondos y a otras leyes aplicables en general al Gobierno del Estado Libre Asociado de Puerto Rico, todo ello enmarcado en el principio de la autonomía judicial.” 4 L.P.R.A. see. 24c.

 El Director Administrativo o la Directora Administrativa de los Tribunales tiene el poder, al amparo de la Ley de la Judicatura de 2003, según enmendada, de tomar cualquier decisión que redunde en un mejoramiento de los servicios que presta la Rama Judicial.
“La Oficina de Administración de los Tribunales desempeñará los deberes que propicien el aceleramiento de los trámites judiciales; establecerá medidas para lo-grar la evaluación, eficiencia y excelencia en la prestación de servicios y cualesquiera otros deberes afines que disponga el Juez Presidente para el mejor funcionamiento del sistema judicial.” 4 L.P.R.A. sec. 24n.

 El Informe de la Comisión de la Rama Judicial a la Convención Constitu-yente en 1952, lee como sigue:
“Se recomienda que se traspase al Tribunal Supremo la facultad de administrar los tribunales de justicia de Puerto Rico, facultad que se viene ejerciendo por el Procurador General. La Comisión entiende que las disposiciones de esta sección con-tienen garantías básicas del Poder Judicial. La Rama Ejecutiva no debe intervenir en función que es tan claramente de índole judicial.” 4 Diario de Sesiones de la Convención Constituyente 2608, 2613 (ed. 1961).
Para ello, el propio Informe expresa que ha examinado los precedentes de la Constitución federal y las disposiciones vigentes en California, Connecticut, Kentucky, Maryland, Missouri, Nueva Jersey y West Virginia, así como los escritos del Decano de la Escuela de Derecho de Harvard, Roscoe Pound. Véase id.
Como puede apreciarse, cuando la Comisión de la Rama Judicial recomienda que se traspase al “Tribunal Supremo” la facultad de administrar los tribunales lo hace para proteger, en primer término, a la Judicatura frente al Poder Ejecutivo. Sin embargo, como se aclara más adelante, la facultad de administrar se le confiere específicamente al Juez Presidente, como medida para protegerlo frente al Pleno del Tribunal, tal y como nos ilustran las expresiones de Ramos Antonini.

 Véanse: R. Proc. Por Salud Jueces T.P.I.y T.A., 131 D.P.R. 630, 644 (1992); Feliciano Rosado v. Matos, Jr., 110 D.P.R. 550, 568-569 (1981). Véase In re Justices of Supreme Court of Puerto Rico, 695 F.2d 17 (1er Cir. 1982).

 La Ley Núm. 80 de 2 de julio de 1987 autoriza a la Oficina de Administración de Tribunales a realizar investigaciones sobre sus funciones y recursos. Véase Expo-sición de Motivos de la Ley Núm. 80, supra, 1987 Leyes de Puerto Rico 307-308.
“Se faculta al Director Administrativo o al funcionario designado por éste, a los abogados y auditores de la Oficina de Administración de los Tribunales a tomar juramentos, requerir la comparecencia de testigos y requerir la presentación de li-bros, registros, documentos u objetos pertinentes a las investigaciones que realicen en el desempeño de sus funciones oficiales.
“Las declaraciones juradas obtenidas bajo las disposiciones de las sees. 335 a 340 de este título serán usadas únicamente para fines administrativos de la Oficina de Administración de los Tribunales y no podrán ser usadas en procedimientos cri-minales contra quienes las prestaron.” 4 L.P.R.A. sec. 335.

 Estos requisitos adicionales son: (1) que el acuerdo se haya hecho constar por escrito, (2) que se mantenga un registro fiel con miras a establecer la existencia del contrato, (3) que se envíe copia de éste a la Oficina del Contralor y (4) que se acredite la certeza de tiempo, esto es, que el contrato se otorgó no más de quince días antes. Mun. Quebradillas v. Corp. Salud Lares, 180 D.P.R. 1003, 1013 (2011); Fernández & Gutiérrez v. Mun. San Juan, 147 D.P.R. 824, 830 (1999); Hatton v. Mun. de Ponce, 134 D.P.R. 1001, 1006 (1994). Tbdo acuerdo en contravención a estas normas es ineficaz. Fernández & Gutiérrez v. Mun. San Juan, supra, pág. 833.

 En cuanto a la penalidad por desacato, la See. 2 de la Ley de Desacato dispone lo siguiente:
“El Tribunal Supremo y el Tribunal de Primera Instancia de Puerto Rico ten-drán facultad para castigar el desacato a su autoridad con prisión por un período máximo de treinta (30) días, en la cárcel local más inmediata al tribunal, o con multa máxima de doscientos dólares ($200) o ambas penas, a discreción del tribunal. El Tribunal de Distrito y cualquier otro tribunal análogo o semejante y la Comisión Industrial de Puerto Rico, tendrán facultad para castigar el desacato, según ex-puesto anteriormente, dirigido a dicho tribunal, mediante una multa máxima de veinticinco dólares ($25), y en defecto del pago de dicha multa la persona declarada culpable podrá ser recluida en la cárcel local más inmediata a dicho tribunal por un período máximo de veinte (20) días.” 33 L.P.R.A. sec. 518.

 Así nos lo recuerda el Prof. José Julián Álvarez González en su interpreta-ción de la obra de 1962 del constitucionalista estadounidense Alexander Bickel, The Least Dangerous Branch.
“No conozco un mejor esfuerzo por contestar la pregunta sobre qué limita las interpretaciones constitucionales de los jueces que el de Alexander Bickel. Tomán-dome grandes libertades con su extremadamente complicado conjunto de respuestas, *635 su contestación fue: nada, pero todo. Nada, en teoría, porque si los jueces supremos están decididos a alcanzar una solución que personalmente desean, tienen el poder para ello. No obstante, sostuvo Bickel, todo en la práctica los constriñe: el texto constitucional, la historia y la estructura, la naturaleza colegiada de la Corte, el requisito de caso o controversia, los precedentes, la obligación de los jueces de justi-ficar sus decisiones, la opinión pública, su falta de una base política y la necesidad de lograr la cooperación de las otras ramas para poner en vigor sus decisiones, su deseo por mantener prestigio personal e institucional y su propio sentido de humildad y duda.” (Citas omitidas.) J.J. Alvarez González, Otra mirada a la “Constitución dis-crecional”, en R. Saba (ed.), Estado de derecho y democracia: un debate acerca del “Rule of Law”, Buenos Aires, Ed. Universidad de Palermo, 2001, pág. 183.